[No. 35133-8-I.    Division One.    December 11, 1995.]

*In the Matter of the Marriage of* CANDIDA SHELLENBERGER, *Respondent, and* P. RICHARD SHELLENBERGER, *Appellant.*

72

*Heather Houston* and *Gibbs, Houston & Pauw*, for appellant.

*H. Michael Fields* and *Anderson & Fields*, for respondent.

KENNEDY, J. — P. Richard Shellenberger appeals the denial of his petition to modify the college education provisions of the decree dissolving his marriage to Candida Veranth. The decree incorporated a settlement agreement wherein Shellenberger agreed to pay one-half of the college education expenses for the parties' two children, Amber and Joshua. Shellenberger is a former King County firefighter with a permanent, total psychological disability. He is the sole custodian and provides the sole support for the minor child of his subsequent marriage, Kalyn. Shellenberger argues that the trial court erred in finding that the total disability was a contemplated change of circumstances, and in finding him voluntarily underemployed and capable of providing half the cost of four years in college for the children of the first marriage. The trial court imputed to Shellenberger income in addition to his disability benefits and small income from odd jobs and part-time work, and required him to pay $1,434.81 per month toward the college education expenses of Amber and Joshua. This sum includes half the anticipated cost of Amber's education at Seattle University, a private institution, and half the anticipated cost of Joshua's education at the University of Washington.

The record does not support the trial court's finding that the parties agreed that the college education clause would not be modified even in the event of Shellenberger's disability, or its finding that Shellenberger is capable of paying $1,434.81 per month or any similar sum toward the college education expenses of the two older children.[1] The trial court made no findings as to Shellenberger's age, physical and emotional health, training, skills, work experience, preexisting debt load, living expenses, child care and child support responsibilities for Kalyn. Thus, the trial court's findings do not support its order. Accordingly, we reverse the trial court's order imputing income to Shellenberger and ordering Shellenberger to pay $1,434.81 per month in postsecondary education support. The trial judge having died while this appeal was pending, we remand for a new trial.[2]

## FACTS

Shellenberger and Veranth entered into a separation agreement on August 19, 1981. They had two children: Amber, then eight, and Joshua, then seven. Regarding education, the agreement states:

> Husband shall have no duty of support for the children after they reach the age of 18 except husband agrees to pay directly to the child one-half of their educational expenses after age 18 and the educational expenses include housing and food.

Clerk's Papers at 9. The agreement contains specific provi-

---

[1] A temporary order entered prior to trial required Shellenberger to pay $1,310.32 per month for college education expenses for Amber and Joshua. This order was based on the determination that Shellenberger's disability was a contemplated change of circumstance. The record at the time of the hearing on temporary support does not support this determination. Shellenberger has appealed the temporary order as well as the modification order. We reverse the temporary order and vacate the ensuing judgment for arrearages which accrued under that order to the time of the modification trial.

[2] This ruling makes it unnecessary for us to reach the question of whether the trial court abused its discretion in denying Shellenberger's motion for reconsideration.

sions for adjustment of child support in the event of either parent's disability during the children's minority, but that specific language is not included in the college education clause. However, the contract contains a separate paragraph acknowledging that the support agreements can be modified by the court based on changed circumstances:

> The foregoing provisions . . . are based upon the conditions existing as of the date of this agreement. It is understood that the Court has the power to review both the custody and support provisions from time to time as circumstances may change, and to make such further orders as may be appropriate based on such changed circumstances.

Clerk's Papers at 11-12.[3]

In 1989, Shellenberger went on disability leave from his position as a Firefighter III/Battalion Chief at King County Fire District 16. The leave was approved by the King County Disability Retirement Board in November 1989, and again after full review in March 1990. This finding was subject to regular six-month review, but in July 1992, the Disability Retirement Board informed Shellenberger that it considered his disability "unrecoverable," and would no longer review his case.

The next month, a commissioner of the King County Superior Court entered an order on Veranth's motion to clarify the separation agreement. The commissioner concluded that the agreement was unambiguous and unconditional with regard to Shellenberger's responsibility to pay college expenses.

In December 1993, Shellenberger filed a petition for modification of child support, asking for a reduction of his

---

[3]It is clear from the briefing below and on appeal, as well as from oral argument for this appeal, that the parties' counsel simply overlooked the existence of this modification clause. The clause unquestionably applies to the college education provisions of the contract and belies Veranth's position that the college education clause was intended to be nonmodifiable, even in the event of Shellenberger's disability. Accordingly, we need not decide whether parties *may* enter into a nonmodifiable postsecondary education agreement, in the absence of any statutory provision therefor.

postsecondary education obligation to the sum of $200 per month for each child.

On March 1, 1994, the King County commissioner entered an order on a motion by Veranth regarding college expenses. The commissioner set Shellenberger's support obligation at $1,310.32 a month.

Shellenberger's modification petition was heard on a trial by affidavit. Shellenberger requested modification of the agreement based on his disability and the fact that he had custody of a child, Kalyn, who was eight years old at the time of trial. Shellenberger is the sole custodian of Kalyn. He receives no support from the child's mother.

Shellenberger stated that he took antidepressant medication for a year after going on disability. He had worked at a collection agency for over a year, and parlayed this work into an attempt to start his own collection agency with a partner. But this business failed. He next found full-time work as a traveling vinyl siding salesman, but left this job after six months because the travel requirements did not mesh with his child care responsibilities for Kalyn, and he could not make enough money to afford day care. He needed a salary of at least $1,200 a month in order to work full time and afford day care. Although he listed 20 places where he had applied for positions, Shellenberger averred that he could not find regular work. He suspected that prospective employers learned, on investigating, that he was receiving full disability from the state, and therefore would not hire him.

Shellenberger declared that he was currently heavily in debt, having borrowed money to meet living expenses after Veranth received an assignment of half his disability pay (following entry of the temporary order), and that his net income (after the assignment was vacated) was $2,500 a month.[4] This amount included his disability income of $1,800 and income of $700, on average, from odd jobs such

---

[4]Between November 1992, and January 1994, Shellenberger's disability income amounted to only $900 a month as a result of the wage assignment.

as collecting and selling baseball cards and raising rhododendrons for sale, and from a part-time position he was able to acquire. Shellenberger's monthly expenses, before considering his postsecondary support obligation, totaled $2,531. This included a first mortgage payment of $1,069 and a second mortgage payment of $463.[5] Based on all of this information, Shellenberger requested the court to set his monthly college education contribution at $200 per month per child, with such payments ending at each child's 23rd birthday. By the time of the modification trial, Amber was 22 and Joshua was 20.

Veranth presented evidence that Shellenberger had worked full time in sales after going on disability. She specifically noted that Shellenberger acknowledged that he was able to work full time at tasks not related to fighting fires. She also offered affidavits from several prospective employers whom Shellenberger had listed as places where he had applied for work. A New York Life Insurance representative said that he had interviewed Shellenberger, but that Shellenberger had terminated his application by failing to appear for a second meeting. The pay for that particular position was on commission basis—the one agent remaining of five hired the previous year had earned $19,000. An Allstate Insurance human resource representative declared that Shellenberger had not applied for a position with that organization, despite Shellenberger's claim of having done so. She stated that Allstate had two adjuster positions available at the present time, one in Federal Way and one in Marysville. Finally, the manager of the personnel office at Washington Natural Gas stated that he had not received any application for a sales posi-

---

[5]The record on appeal does not reflect the purpose or amount of Shellenberger's second mortgage. An affidavit filed in support of his request for attorney fees on appeal indicates that, after trial, Shellenberger rolled a preexisting $31,000 second mortgage balance into a refinanced second mortgage in order to pay attorney fees incurred for trial. As a result, his second mortgage payment increased to $771 per month.

tion from Shellenberger either.[6] He stated that several positions had been open at the time of Shellenberger's disability. Veranth did not submit declarations or affidavits from any of the 17 other places Shellenberger said he had contacted regarding employment.

Amber described the circumstances surrounding her delay in acquiring a bachelor's degree and the causes of her substandard academic performance to the time of trial. She suffered an automobile accident while attending community college which caused her to miss some finals for that quarter and impacted her ability to participate in school for the following quarter. She also could not afford books and other expenses. In a sworn statement, one of Amber's high school counselors opined that Amber's grades in high school suffered as a result of her parents' divorce, and as a result of two traumatic events involving friends of hers. Amber's grades were not high enough to allow her to attend the University of Washington, but she had been conditionally accepted, on academic probation, at Seattle University, after dropping out of community college.

Joshua's affidavit described emotional problems which had caused him to drop out of the University of Washington and to seek counseling. Joshua's grades in high school were outstanding, but he had done poorly in his first quarter at the University.

The trial court found Shellenberger's and Veranth's ability to contribute to the postsecondary education of their children "virtually equal." Clerk's Papers at 293. Veranth, who worked as a real estate agent, grossed $56,188 in 1993, which amount was equivalent to approximately $3,400 a month net of business expenses and taxes. Thus, the court effectively found that Shellenberger could earn a *net* annual income of some $19,000 ($1,600

---

[6]Shellenberger contended that he had no interest, skills or ability for life insurance sales; that he applied at a completely different branch of Allstate from the one Veranth contacted, and that he applied to be a vinyl siding salesperson, as opposed to a general salesperson, at Washington Natural Gas.

per month) over and above his disability pay, instead of only $8,400 annually ($700 per month).[7]

The court found that Amber's chosen educational path (engineering), coupled with her past personal difficulties and failure to gain admission to the University of Washington, made Seattle University a reasonable choice, in spite of the higher tuition there. The court also found Joshua's delay in attending the University of Washington to be reasonable.

In its conclusions of law, the court stated that whether the court based its ruling on the financial condition of the parties at the time of trial or on the fact that Shellenberger's disability was contemplated by the parties when crafting the separation agreement, the petition for modification should be denied. The court ordered Shellenberger to pay for one-half of each child's college education, totaling $1,454.83 per month, through June 1998. The court also required each child to send Shellenberger his/her grades, to apply for all available scholarships and to send these applications to Shellenberger. Shellenberger's obligations would be suspended for periods during which the children were either not enrolled or were not in good academic standing.

This timely appeal followed.

DISCUSSION

I

MODIFICATION OF AGREEMENT

Shellenberger argues that the trial court abused its discretion in concluding that there had been no uncontemplated change in circumstances between the filing of the decree and the petition for modification.

█ With some statutory exceptions not argued here, the support provisions in a dissolution decree are modifiable

---

[7]Shellenberger's disability pay is tax free. His additional earnings are subject to federal income taxes.

only on a showing of an uncontemplated, substantial change in circumstances. RCW 26.09.170(1); *cf. Wagner v. Wagner*, 95 Wn.2d 94, 98, 621 P.2d 1279 (1980); *see Holaday v. Merceri*, 49 Wn. App. 321, 331, 742 P.2d 127, *review denied*, 108 Wn.2d 1035 (1987). A trial court's decision concerning modification is reviewed for abuse of discretion. *See Lambert v. Lambert*, 66 Wn.2d 503, 508, 403 P.2d 664 (1965).

The trial court found that the primary change of circumstances asserted by Shellenberger, his reduced income stemming from his disability, was contemplated by the parties, in view of the specific provision of the settlement contract providing for an adjustment of child support during the children's minorities in the event of a parent's disability—and no corresponding provision specifically relating to the college education clause. However, as we have noted, the settlement agreement specifically allows for modification of support where circumstances have changed, in a separate paragraph.

Accordingly, the record does not support the conclusion of the trial court (or of the court commissioner at the time of the temporary order) that Shellenberger's disability was a contemplated change of circumstance which was not intended to provide a basis for modification of the college education clause.

## II

### IMPUTED INCOME

■ Shellenberger contends that the trial court erred in imputing to him additional income beyond his disability pay and small monthly income from odd jobs and part-time employment. He asserts that (1) the trial court ignored the impact of his disability, and (2) the trial court's finding that his ability to pay for his children's education was "virtually identical" to Veranth's ability is not supported by substantial evidence. We review the trial court's findings of fact following a trial by affidavit to determine whether they are supported by substantial evidence, and

whether the trial court made a correctable legal error. *In re Stern*, 68 Wn. App. 922, 929, 846 P.2d 1387 (1993).

██ ██ Voluntary unemployment or underemployment does not shield a parent from child support obligations. RCW 26.09.170(6). In *In re Blickenstaff*, 71 Wn. App. 489, 495, 859 P.2d 646 (1993) the court defined voluntary unemployment under RCW 26.09.170 by reference to RCW 26.19.071(6) (enacted in 1991). That statute provides in relevant part:

> The court shall impute income to a parent when the parent is voluntarily unemployed or voluntarily underemployed. *The court shall determine whether the parent is voluntarily underemployed or voluntarily unemployed based upon that parent's work history, education, health, and age, or any other relevant factors.* . . . In the absence of information to the contrary, a parent's imputed income shall be based on the median income of year-round full-time workers as derived from the United States bureau of census . . . .

RCW 26.19.071(6) (emphasis added); *see also Lambert v. Lambert*, 66 Wn.2d at 508-10 (where optometrist abandoned job to maintain ailing solo practice, *held:* reduction in income was "self-induced"); *Carstens v. Carstens*, 10 Wn. App. 964, 967-68, 521 P.2d 241 (1974) (modification reversed where respondent's changed financial circumstances resulted from his "decision" to support his alcoholism from his existing assets and not to pursue employment as an accountant, though qualified to do so).

In this case, Shellenberger clearly was able to earn some income above and beyond his disability pay. He was earning $700 per month from odd jobs and part-time employment at the time of trial, and he had worked full time in collection work and as a traveling vinyl siding salesman for a period of time following his disability retirement. Income should be imputed at the level "at which the parent is capable and qualified." *In re Sacco*, 114 Wn.2d 1, 4, 784 P.2d 1266 (1990) (citing Washington State Child Support Commission's 1987 report to the Legislature). There

is no evidence in this record that Shellenberger was capable and qualified of earning net income of $1,600 per month over and above his disability pay. He was not earning even $1,200 a month when he was working full time, following his disability retirement.

Even if the trial court believed that Shellenberger failed to apply at Washington Natural Gas and at Allstate, as Veranth contends, there is no evidence that Shellenberger, if hired at either of those places, could have earned the amount imputed by the court. As for the position at New York Life for which Shellenberger failed to complete the application, only one out of five agents hired for the available openings was able to earn $19,000 in his or her first year. The other four agents apparently failed in their positions, or in any event went on to some other kind of employment. There is no evidence that Shellenberger, who has no background in life insurance sales, could have done any better than those four.

■ The task on remand requires more than the making of realistic findings with respect to the income Shellenberger may be capable and qualified of earning from his labor. The court must also make specific findings with respect to Shellenberger's responsibilities to his minor daughter Kalyn. Where the trial court imputes income to a parent for purposes of providing support through college of adult children, the court *must also* consider that parent's support obligation for any minor children, and the day care expense for those children which would result if the parent were actually earning the income imputed by the court. A parent obligated to support his or her minor children cannot be deprived of adequate money to meet those obligations, in favor of supporting adult children through college. The trial court made no findings with respect to Shellenberger's obligations to Kalyn, and with respect to his ability to meet those obligations while contributing to his older children's college educations.

The trial court must also consider the obligor parent's preexisting debts and reasonable monthly living expenses.

The trial court made no findings regarding these factors. In Shellenberger's financial affidavit filed for the trial, he claimed to have $138,000 in outstanding home mortgages, requiring $1,534 in monthly payments. In his deposition taken in February 1994, Shellenberger described at least $13,000 in additional debt incurred over the previous year, as a result of the wage assignment. Although the evidence fails to support the trial court's finding that Shellenberger was capable and qualified of earning $1,600 per month over and above his disability pay, even if he could do so, we observe that the combined sums of his monthly living expenses, debt service and the college education obligation imposed by the court greatly exceed the amount of his actual and imputed income.[8]

## III

### POSTSECONDARY EDUCATION

### A

### The Trial Court's Order

As noted above, the trial court ordered Shellenberger to make monthly postsecondary education support payments that, when combined with his debt service and living expenses, exceed his income, even the net income amount imputed by the trial court. A trial court's decision concerning modification is reviewed for abuse of discretion. *See Lambert v. Lambert*, 66 Wn.2d at 508; *In re Coyle*, 61 Wn. App. 653, 659, 811 P.2d 244, *review denied*, 117 Wn.2d 1017 (1991).

---

[8]Veranth suggested at oral argument for this appeal that some of Shellenberger's debt was voluntarily incurred. *See* RCW 26.19.075 (setting as one standard for deviation from the child support schedule table amount excessive debt not voluntarily incurred). We do not attempt, on a record devoid of evidence or findings to this effect, to decide what constitutes excessive debt voluntarily incurred for purposes of that statute. We do note that the child support schedule is only advisory with respect to postsecondary education support. RCW 26.19.090. However, we believe that a trial court may properly consider whether excessive debt has been voluntarily incurred in order to avoid a child support *or* college education obligation. This is not to imply that a parent obligated to provide support for adult children through college is necessarily required to forego owning his or her own home, automobile and other basic necessities, in order to provide adult children with a free college education.

■ Although every case must be decided on its own facts, a postsecondary education support obligation that would force the obligor parent into bankruptcy, or force that parent to liquidate the family home because he or she cannot make both the support payment and the mortgage payment will, in most cases we can presently envision, amount to a patent abuse of discretion.[9] This is especially true where the parent also supports a minor child, and the postsecondary support obligation prevents the parent from meeting that obligation to the minor child.[10]

At the new trial, the trial court must make specific findings as to Shellenberger's ability to pay while still meeting his own reasonable needs and obligations. This includes the need to service preexisting debt reasonably incurred, to pay reasonable monthly living expenses, and to support the minor child Kalyn, including the imputed cost of the day care which would become necessary for Kalyn if income is imputed to Shellenberger based on a finding that he is qualified and capable of finding full-time employment. The court also should consider the adult children's ability to contribute to their own educations through grants, scholarships, student loans and summer and/or part-time employment during the school term, as well as the ability of Veranth to reasonably contribute, consistent with her own preexisting debts reasonably incurred and her reasonable living expenses.

## B

### Private v. Public Education

Shellenberger relies on *In re Stern*, 57 Wn. App. 707,

---

[9]The trial court should evaluate whether the parent has attempted to avoid his or her obligation, or whether he or she is simply of modest means.

[10]Where the trial court must choose between the higher education needs of an adult child and the support needs of a minor child, the needs of the minor child should weigh more heavily. Where a family is of modest means, parental desire to provide adult children with a free college education simply may not be realistic.

789 P.2d 807, *review denied*, 115 Wn.2d 1013 (1990) to argue that the trial court erred in ordering Shellenberger to help fund Amber's education at Seattle University, a private institution. In *Stern*, the trial court ordered one parent to pay part of the private primary education expenses of the parents' minor children. *Stern*, 57 Wn. App. at 716-17. The reviewing court concluded that the trial court erred by concluding that the cost of private education was equivalent to public education plus the necessary postschool day care, where there was no evidence presented on this issue. *Stern*, 57 Wn. App. at 719-20; *see also In re Vander Veen*, 62 Wn. App. 861, 865-66, 815 P.2d 843 (1991) (applying *Stern*, and holding that under some particular circumstances, including but not limited to family history, religion or past attendance at private schools, private education can be ordered by the trial court).

To the extent that *Stern* and *Vander Veen* may have any application to questions of postsecondary education support, a proposition which the parties have not briefed or effectively argued, we conclude that the trial court must, at the very least, make specific findings as to the cost and availability of college education in the child's chosen field at publicly funded institutions before ordering an objecting parent to support a more expensive private college education. A trial court should not require objecting parents of modest means to pay for private college where the child can obtain a degree in his or her chosen field at a publicly subsidized institution. Where one or both parents is in financial difficulty, community college definitely should be considered, particularly for the first two years, and particularly where credits for basic and degree requirements are transferable to a state-supported university. This is especially true where, as here, none of the factors discussed in *Stern* and *Vander Veen* appear, and Shellenberger, at least, is in economic distress as a result of the order imposed upon him. In the instant case, the trial court required Shellenberger to pay one-half of $4,500 per quarter in private tuition without making

specific findings that no less expensive but academically acceptable option existed.[11] *Cf. Stern,* 57 Wn. App. at 719-20.

## C

### Education Past Age 23

On remand the trial court should consider Joshua's and Amber's academic performance to the date of the new trial, and any additional delay by either child in pursuing a college degree. A trial court does not necessarily err by ordering a parent to contribute to college expenses past the child's 23rd birthday. Here, although the trial court properly recognized and sympathized with the children's emotional and financial problems which contributed to the delays to the time of trial, ordering financial support for four consecutive years for each of these adult children probably was premature, in view of their poor academic performances to the time of trial. The trial court's order and RCW 26.19.090 merely suspend the obligation during periods of noncompliance by the children. Because the parents must ultimately be relieved of the obligation at some point,[12] and because these children had not performed well to the time of trial, an order requiring periodic review by the court which makes demonstrated academic progress a condition of continuing the obligation may more successfully accomplish the policy of RCW 26.19.090(5), and be more easily and effectively administered. Here, there is ample evidence in the record that Shellenberger is totally estranged from Veranth, Amber and Joshua. Moreover, motions filed during the pendency of the appeal

---

[11]The trial court made specific findings that Amber's decision to attend Seattle University was reasonable in light of her prior academic record, educational goals, financial and emotional problems, car accident and inability to receive admission to the University of Washington. On remand, these findings must be weighed in relation to specific findings concerning the economic realities facing Amber's parents.

[12]The statute accomplishes this by presumptively ending the support obligation at age 23. RCW 26.19.090(5). Under the existing order, the cutoff date for Amber will not expire until she is over 26 years of age.

reflect that these adult children may have refused to provide Shellenberger with copies of their grades, despite the court order that they do so. In these circumstances, we commend to the trial court a process which will make the children responsible to report academic progress *to the court*, as well as to Shellenberger, as a condition of continued court-ordered parental support. Failure to demonstrate significant academic progress probably should result in the termination of the support obligation, not merely its suspension, in the peculiar circumstances of this case.

## IV

### ATTORNEY FEES

At both the trial and appellate levels in a dissolution or postdissolution proceeding, a court asked to apportion attorney fees must consider the parties' relative need and ability to pay. *In re Griffin*, 114 Wn.2d 772, 779-80, 791 P.2d 519 (1990). Shellenberger has demonstrated a need for an award of attorney fees on appeal. In order to prevent unnecessary bifurcation of the postappeal proceedings, we remand to the trial court the issue of Veranth's ability to pay all or a portion of Shellenberger's attorney fees on appeal, and the amount of fees to be awarded in the event that she does have the ability to pay.

Reversed and remanded for a new trial.

BAKER, C.J., and COLEMAN, J., concur.