# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

<table>
<tr><td>In the Matter of the Marriage of</td><td>)</td><td>No. 75734-2-I consolidated w/</td></tr>
<tr><td></td><td>)</td><td>No. 76830-1-I</td></tr>
<tr><td>BARRY DAVID ARONSON,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Respondent,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>DIVISION ONE</td></tr>
<tr><td>and</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>JENNIFER ARONSON,</td><td>)</td><td>UNPUBLISHED OPINION</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Appellant.</td><td>)</td><td>FILED: September 4, 2018</td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

MANN, A.C.J. — Jennifer Cross (f.k.a. Aronson) appeals and Barry Aronson cross appeals the trial court's characterization of stock options, division of property, award of maintenance, and child support calculations in the dissolution of their long-term marriage. We conclude that the trial court erred in failing to ascertain whether the stock options were granted to compensate Aronson for past, present, or future employment services. We remand to the trial court for it to recharacterize the stock options and enter judgment for Cross's attorney fees. In all other respects, we affirm.

## FACTS

### The Marriage

Aronson and Cross married in June of 1994. At the time, Cross was a doctoral candidate studying comparative religion at Harvard University and Aronson was a software engineer. The couple had a son, William, in the summer of 1994. Cross took maternity leave to care for him.

Eventually, the couple left Boston for Aronson's career. They moved frequently for Aronson's work, and in 2013, after Microsoft hired Aronson, they moved to Seattle. Although she finished her doctoral coursework, Cross did not complete her doctorate and instead stopped working toward it when she became pregnant with the couple's second child, Tomm. Although Cross originally planned to restart her studies and obtain her doctorate, she never did.

Aronson "has enjoyed a successful career in software engineering that has involved significant travel around the world and many moves around the country to take advantage of ever increasing job opportunities." At the time of trial, Aronson earned a base salary of $185,000 a year. In addition, he received variable annual performance bonuses. In 2015, Aronson received a $45,000 bonus. Cross did not work outside of the home. Cross "personally supported [Aronson] and the family during these times, packing and unpacking households, entertaining clients and co-workers and caring for and homeschooling the children.

While Aronson was healthy and led an active lifestyle, Cross was not. The trial court found that Cross

> [h]as significant medical issues that render her unable to work a full-time job. The evidence showed that she has had degenerative neck and back

No. 75734-2-I/3

complications throughout the marriage resulting in progressive disability, and has had several surgeries to address the same which have not been successful. Also that she has suffered from carpal tunnel syndrome periodically throughout the marriage and cubital tunnel syndrome since just prior to the date of separation, for which conditions surgery has been recommended. Also that when she has tried to work during the past two years it increases her pain. During the course of trial further evidence of permanent nerve damage was revealed.

The parties separated on December 11, 2014, the same day that Aronson petitioned for dissolution.

### Trial and Decree

After an eight-day trial, the trial court entered findings of fact and conclusions of law, and a decree of dissolution on June 30, 2016. The trial court largely agreed with Cross's characterization of the parties' property and admitted that its decision "favor[s] Ms. Aronson a bit more than Mr. Aronson."

The court originally awarded Aronson his checking account, which held $3,097, his car, inheritance, personal property, airline miles, and any future Microsoft stock awards. The court awarded the remaining community and separate property, including bank accounts and retirement accounts, to Cross:

> The best way for the Court to try and provide for their retirement . . . is through award of property. . . . I think the appropriate way . . . to deal with it is to award all of the property, both separate and community, other than a . . . Mr. Aronson's checking account, to Ms. Aronson. So she should get all of the accounts, all the retirement accounts, all the property.

The trial court awarded Cross $5,200 monthly maintenance. The court found that after two years Cross "could be expected to work" and consequently reduced the maintenance award to $4,200 per month after two years. The court ordered maintenance to continue until Aronson's full retirement.

-3-

Based on the standard calculation, the trial court ordered Aronson to pay $1,124 in monthly child support until the younger son, Tomm, graduates high school or turns 18. The court also ordered that Aronson pay 100 percent of the post-secondary education costs for the older son, William, up to a cap of $30,000 and to pay "all similar post-secondary educational expenses for Tomm." The court further ordered that Cross would be the "custodian of all 529 accounts and other educational accounts." Aronson was ordered to pay all medical expenses for William and Tomm. The court ordered that Cross's maintenance would increase after the child support ends, but reserved decision on the amount.

Finally, the trial court awarded Cross attorney fees and ordered that they be paid out by Aronson's Microsoft stock awards that had been awarded but not yet vested.

### Posttrial

In July 2016, Cross moved for reconsideration, requesting the court to increase the maintenance award and order that all of Aronson's future stock awards be split between the parties. The trial court granted the motion in part, agreeing to increase Cross's maintenance to $6,700 per month and ordering that Aronson split all future stock awards with Cross. The court also decreased Aronson's child support transfer payment to Cross from $1,124 to $963 to reflect the higher maintenance amount.

In August 2016, Cross moved to enforce the decree. She alleged, in part, that Aronson had delayed transferring his assets, delayed paying credit card balances, and delayed filing their 2014 and 2015 tax returns. The trial court denied most of Cross's motion, ordering only that Aronson complete the 2014 and 2015 tax returns within 10

-4-

No. 75734-2-1/5

days of its order. The court explained its ruling: "[Aronson] was slow in complying with the court's order, but that does not justify [Cross's] declaration of WAR."

Cross then filed two separate contempt motions and a motion for clarification alleging that Aronson failed to pay $2,387.41 in required childcare, and $15,905.45 in post-secondary expenses for William, failed to transfer the 529 education accounts, withdrew funds from the 529 account that had been established for William, and failed to provide information relating to tax returns for 2014 and 2015. Aronson also filed a contempt motion claiming that Cross refused to sign the joint tax returns for 2014 and 2015 and instead filed separate returns for 2014 and 2015 stating that she had zero income.

The trial court held both parties in contempt. The court found that Aronson owed $829.68 in expenses for Tomm and ordered that he transfer all 529 accounts to Cross and re-establish a 529 account for William with funds from his father's estate. The court found Cross in contempt for intentionally filing separate returns to identifying her income as zero in order to increase William's financial aid which "constituted fraud on the University of Texas."

Cross then moved for reconsideration of the contempt order, arguing that Aronson had not met his child support obligations and that she should not have been found in contempt. The trial court ruled that Aronson owed an additional $43,675.75 in post-secondary expenses, but otherwise denied reconsideration. In a separate order, the trial court ruled that Aronson owed Cross $3,074.59 in back maintenance and miscellaneous expenses.

Cross appealed and Aronson cross appealed.

-5-

## ANALYSIS

### Cross's Appeal

Cross makes nine arguments on appeal. We address each in turn.

A. Characterization of Microsoft Stock Awards

Cross first contends that the trial court incorrectly characterized Aronson's Microsoft stock awards as his separate property. We agree.

This court reviews de novo a trial court's characterization of property as separate or community. In re Marriage of Mueller, 140 Wn. App. 498, 503-04, 167 P.3d 568 (2007). In Washington, assets acquired during marriage are presumed to be community property. In re Marriage of Short, 125 Wn.2d 865, 870, 890 P.2d 12 (1995). Characterization of the property, however, is not necessarily controlling; the ultimate question being whether the final division of the property is fair, just and equitable under all the circumstances. Baker v. Baker, 80 Wn.2d 736, 745-46, 498 P.2d 315 (1972).

The characterization of employee stock options as separate or community property depends on when the stock options were acquired. Short, 125 Wn.2d at 871. A vested employee stock option is acquired when granted, but determining when an unvested employee stock option is acquired requires applying the "time rule." Short, 125 Wn.2d at 871. This "is a formula for allocating stock options according to the employment services performed prior to and after the date the parties were living separate and apart." Short, 125 Wn.2d at 872 (internal quotations omitted).

The first step in characterizing unvested stock awards is to determine whether they compensate past, present, or future services:

> To determine how unvested employee stock options are
> characterized under RCW 26.16, a trial court must first ascertain whether

the stock options were granted to compensate the employee for past, present, or future employment services. This involves a specific fact-finding inquiry in every case to evaluate the circumstances surrounding the grant of the employee stock options. Unvested employee stock options granted during marriage for present employment services, assuming the parties were not "living separate and apart" under RCW 26.16.140 when the stock options were granted, are acquired when granted. Unvested employee stock options granted for future employment services are acquired over time as the stock options vest.

Short, 125 Wn.2d at 873 (emphasis added).

After the court determines whether the options were granted for past, present, or future employment services, it then applies the "time rule" to the "first stock option to vest" after the separate date; it does not apply the time rule to every stock option that vests after the separate date. Short, 125 Wn.2d at 874-75.

At issue before us are three awards of stock options: (1) an "On Hire" award of 1,878 shares on April 21, 2014, of which 1,127 shares remained unvested, (2) a "FY 14 Annual SA" award of 991 shares on August 29, 2014, of which 694 shares remained unvested, and (3) a "FY15 Annual SA" award of 2,069 shares on August 31, 2015, of which 1863 shares remained unvested. A percentage of shares vest each year at the end of August. For the unvested shares to vest, Aronson would have to remain employed at Microsoft.

As discussed below, the trial court awarded part of the unvested shares to Cross as payment for attorney fees. In doing so, however, the court concluded that the unvested shares were Aronson's separate property:

I think that probably the appropriate way to do that is to—I would not ordinarily award future stock awards, things that had not yet vested. But I think in this case it is clearly his separate property that the stock awards that have not vested. But in this case I think it's appropriate by way of in essence compensation for the attorney's fees that Mr. Aronson has caused in this case to award Ms. Aronson half of the future stock—

stock award that have yet to vest provided that they are from awards he's already received at this point. So if he gets a new award in the future, he doesn't have to split that with her.

But for the ones that he has already at this point received, I recognize that they are considered his separate property going forward, the unvested shares, but I think that it's appropriate that half of that go to Ms. Aronson to compensate her for the attorney's fees that were run up by—by the litigation in this case primarily due to Mr. Aronson's positions and intransigence in the case.

The trial court erred in concluding that the unvested shares were Aronson's separate property without further analysis. The court failed to conduct the specific fact finding analysis required by Short in order to determine which awards were for granted during the marriage for past, present, or future employment. Short, 125 Wn.2d at 873. Because the trial court erred in characterizing the unvested stock options, remand is necessary for the court to evaluate the circumstances surrounding each award, and if appropriate, apply the "time rule" to characterize the unvested shares as separate or community. Short, 125 Wn.2d at 874-75. Once the shares are properly characterized, the trial court has discretion to distribute the unvested shares in a fair, just, and equitable manner. Baker, 80 Wn.2d at 745-46.[1]

B.  Maintenance Award

Cross argues next that the trial court's award of spousal maintenance was manifestly unreasonable. We disagree.

The award of maintenance is within the trial court's broad discretion. Bulicek v. Bulicek, 59 Wn. App. 630, 633, 800 P.2d 394 (1990). The only limitation on the amount and duration of the award is that, in light of the factors listed in RCW 26.09.090, the

---

[1] It appears from Aronson's financial declaration that he is no longer employed by Microsoft. Consequently, this issue may be moot as unvested shares may never vest. The record before us does not resolve this issue, thus remand remains necessary.

award be just. Bulicek, 59 Wn. App. at 633. RCW 26.09.090 requires the court to consider (1) the financial resources of each party, (2) the time it would take for the spouse who is seeking maintenance to acquire education or training for employment, (3) the standard of living and duration of the marriage, (4) the physical and emotional condition of the spouse seeking maintenance, and (5) the ability of the spouse from whom maintenance is sought to meet his or her own financial obligations.

This court reviews factual findings for substantial evidence. Mueller, 140 Wn. App. at 504. Substantial evidence is that which is sufficient to persuade a fair-minded person of the truth of the matter asserted. Katare v. Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012).

After reconsideration, the trial court awarded Cross monthly maintenance of $6,700 for 24 months starting on July 1, 2016.[2] After 24 months, maintenance was reduced by $1,000 to $5,700. This reduced maintenance last until the younger son, Tomm, graduates from high school or turns 18. After his graduation, maintenance increases in an amount that is "reserved."

1.    Base Award

Cross first challenges the trial court's $6,700 base maintenance award claiming that it is manifestly unreasonable given that the court found that she "has no real prospects to work in any substantial capacity."

The record shows that the trial court balanced the factors in RCW 26.09.090 and provided for Cross's maintenance. The trial court specifically considered Cross's health, the couples' long-term marriage, Cross's education and work history, Aronson's

---

[2] The total for July and August 2016, however, was to be $7,700.

successful career and Cross's support of that career, Aronson's retirement plans in determining the maintenance award. Further, the court awarded Cross all of the separate and community property. Cross fails to show that this award was unjust. The trial court properly exercised its discretion in awarding a base maintenance amount of $6,700.

2. Future Reduction in Maintenance

Cross claims next that the trial court's order decreasing maintenance by $1,000 per month after two years is unsupported by substantial evidence and manifestly unreasonable.

Again, the court balanced the factors in RCW 26.09.090—specifically the time it would take for Cross to find employment and her physical condition and concluded that Cross would be able to earn $1,000 two years after dissolution. This was almost one-third of the amount ($2,900) that Aronson asked to be imputed. The trial court's decision is amply supported by the record. Aronson's vocational therapist, Judith Parker, testified that in her opinion Cross could work for four hours a day from home, an environment where she can control her posture and work schedule. Parker also testified that in her opinion Cross could get a part-time job as a technical writer or editor, jobs that were available and would allow her to work from home. Dr. Gary Schuster, Aronson's medical expert, testified that Cross would be recovered from her carpal-tunnel and cubital-tunnel surgeries in about a year and a half after April 2016 and would be able to resume sedentary physical activities.

Because substantial evidence supports the trial court's decision, we disagree that the decision was manifestly unreasonable.

### 3. Maintenance for Life

Cross contends that the trial court's failure to award her maintenance for life was manifestly unreasonable and unsupported by substantial evidence. She cites four cases for support: In re Marriage of Valente, 179 Wn. App. 817, 826-27, 320 P.3d 115 (2014) (reversing an award of $100 maintenance per month until the wife's death because the trial court did not make a finding that the wife's medical condition would actually worsen); In re Marriage of Mathews, 70 Wn. App. 116, 124, 853 P.2d 462 (1993) (reversing a lifetime maintenance award where the trial court did not find that the wife's health problems would prevent her from working); In re Marriage of Morrow, 53 Wn. App. 579, 586-89, 770 P.2d 197 (1989) (affirming a lifetime maintenance award where the statutory factors justified maintenance and the wife suffered from a medical condition that rendered her legally blind and unable to work full time); and Brossman v. Brossman, 32 Wn. App. 851, 856, 650 P.2d 246 (1982) (affirming a ruling that the husband pay maintenance until he retires, his ex-wife dies, or his ex-wife remarries). None of these cases support Cross's position.

Here, ending maintenance at Aronson's retirement was not manifestly unreasonable. The trial court awarded Cross all of the separate and community property, including all of the retirement accounts. It is undisputed that after Aronson retires he will have no income from which to pay maintenance to Cross. Given the trial court's distribution of assets, Cross's argument is without merit.

### 4. Concealing Assets

Cross contends finally that she is entitled to a higher maintenance amount because Aronson concealed assets from the court.

-11-

The trial court agreed and found that Aronson tried to conceal assets from it:

The Husband repeatedly failed to answer discovery necessitating two Motions to Compel which were both granted by the Court. Husband was not forthcoming about the value and extent of his Father's estate (worth approximately $1.5 million) until two weeks before trial when he finally provided a complete picture, despite his being the executor of the estate. The evidence showed that he has been directly receiving account statements for months and has been working with a probate attorney for nine months.

Husband has taken steps to conceal assets from the Wife and this Court including failing to account for funds withdrawn from a UBS account, unilaterally cutting off Wife's access to funds prior to filing[,] which caused her to incur credit card debt, retaining medical reimbursements and moving damage expenses owed to Wife, and failing to pay college expenses for the parties' older son[,] which again caused Wife to incur credit card debt. In addition, starting in February 2016, Husband began consistently paying the Wife's court ordered spousal support late (four months total) providing various excuses for the same, none of which are credible and has withdrawn approximately $47,000 from community accounts in violation of a financial restraining order in February and April 2016.

The court did not, however, abuse its discretion by refusing to increase maintenance for Aronson's alleged concealment of assets. The court addressed the assets that were before it at the time of trial and ordered Aronson to pay for all liabilities incurred with community property as of that date. Moreover, the court was skeptical of Cross's claim that Aronson took money: "both parties suggested that there was money that the other party had that had somehow disappeared. I didn't find that persuasive." The court further explained,

I did not find that either party carried their burden in showing that the other side had . . . made off with money or squandered it or whatever. And, therefore, I thought it was appropriate to have Mr. Aronson pay for these bills basically as of the time—of the time of the final decree of dissolution.

Finally, the court addressed Aronson's misconduct at trial through its award of attorney fees to Cross. We will not disturb the trial court's decision.

-12-

C.    Child Support

Cross next challenges the trial court's decision awarding child support. We review a trial court's child support decision for an abuse of discretion. In re Marriage of Jess, 136 Wn. App. 922, 926, 151 P.3d 240 (2007). We "will not substitute [our] own judgment for that of the trial court where the record shows that the trial court considered all relevant factors and the award is not unreasonable under the circumstances." In re Marriage of Fiorito, 112 Wn. App. 657, 663-64, 50 P.3d 298 (2002).

The trial court determines the child support obligation from a schedule in RCW 26.19.020. This schedule is based on the parents' monthly net income. The schedule ends at a combined monthly net income level of $12,000. RCW 26.19.020. At that income level, the child support obligation for one child aged 11 to 18 is $1,844. RCW 26.19.020. Aronson and Cross agreed that their minor son would live with Cross. The court ordered the total child support obligation to be $1,844, with Aronson paying $963. This calculation was based on the combined net monthly income of $13,595.82: Cross's net monthly income, including maintenance was $6,427.40, and Aronson's net monthly income, excluding maintenance, was $7,168.42.

Cross argues that the trial court erred in not deviating from the statutory schedule. This is so, Cross contends, because a deviation was necessary due to her extra medical costs, that the younger son lives only with her, because Aronson has a live-in girlfriend, and because Aronson has a family inheritance.

The court did not abuse its discretion. There is no requirement that a court deviate from the schedule when the parties' combined net income is above $12,000. "When combined monthly net income exceeds twelve thousand dollars, the court may

-13-

exceed the presumptive amount of support set for combined monthly net incomes of twelve thousand dollars upon written findings of fact." RCW 26.19.020 (emphasis added). The trial court was aware of Cross's need and declined to deviate from the statutory table. Cross's argument that the court did not have all of Aronson's income before it when it made its decision is also not supported by the record—the court divided the assets before it as of the date of trial. And finally, Cross requested a transfer payment from Aronson of $972, Aronson suggested it be $953, and "[a]s a litigation compromise, the parties agree[d] to split the difference."

The trial court did not abuse its discretion in following the statutory child support schedule.

D.    Property Distribution

Cross contends next that the trial court erred in the overall division of assets. We disagree.

We review the division of property for an abuse of discretion. In re Marriage of Muhammad, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). When dividing property in a dissolution action, the trial court's goal is to divide and distribute the parties' property in a "just and equitable" manner. RCW 26.09.080. The trial court must consider (1) the nature and extent of the community property; (2) the nature and extent of the separate property; (3) the duration of the parties' marriage; and (4) the economic circumstances of each spouse at the time the property division is to be effective. RCW 26.09.080.

When evaluating property, the trial court may "consider a spouse's waste or concealment of assets." In re Marriage of Kaseburg, 126 Wn. App. 546, 556, 108 P.3d 1278 (2005). But "it is well settled that when exercising this broad discretion, a trial

court focuses on the assets then before it—i.e., on the parties' assets at the time of trial. If one or both parties disposed of an asset before trial, the court simply has no ability to distribute that asset at trial." Kaseburg, 126 Wn. App. at 556 (internal quotation omitted).

The trial court gave Cross "all of the remaining of the community and separate assets (except [Aronson's] inheritance and award [Aronson] his . . . checking account and inheritance funds as set forth below." She was awarded liquid assets "totaling approximately $390,000" and illiquid assets (the unvested stock awards) of $93,000 for a total of $483,000. The court also awarded her one-half of any stock awards that Aronson may receive in the future. Aronson's checking account held $3,097.49 and his one-third share of his father's roughly $1.5 million estate was less than $500,000. Cross argues that the division of assets was a manifest abuse of discretion. This is so, she contends, because the court should have punished Aronson's waste of community assets and his financial misconduct by invading his inheritance and entering an award of property more favorable to Cross, for example "a judgment against Aronson for $230,000." She cites multiple examples of how Aronson dissipated the community funds before dissolution: he used his checking account to pay fees associated with an unrelated lawsuit (a judgment was entered against Aronson before dissolution); he paid off college loan debt; he bought furnishings for his new apartment when he moved out of the family house; and he bought his girlfriend gifts.

An award of all of the separate and community property to Cross is not an unjust or inequitable distribution. The record does not support that Aronson dissipated assets: the court "did not find that either party carried their burden in showing that the other side

had . . . made off with money or squandered it." "[B]oth parties suggested that there was money that the other party had that had somehow disappeared. I didn't find that persuasive." Moreover, an award of all community and separate property except Aronson's checking account and inheritance was very favorable to Cross. The trial court did not abuse its discretion.

E.    Judgment for Attorney Fees

Cross next claims that the trial court should have entered a judgment for her attorney fees. We agree.

The trial court found Cross "has the need for the payment of fees and costs and [Aronson] has the ability to pay these fees and costs." It also found that Aronson "engaged in litigation tactics and delay which has greatly increased the fees incurred" by Cross. Aronson filed frivolous motions, failed to answer discovery requests, withheld information from the court, concealed assets from Cross and the court, and violated a financial restraining order. As a result, the trial court awarded Cross attorney fees. Instead of awarding a cash payment, however, the trial court awarded half of the total value of the unvested Microsoft stock options that it had characterized as Aronson's separate property. After trial, Cross moved the court to enter a judgment for this amount in her favor. The court declined to enter a judgment.

Courts presiding over dissolution actions may award attorney fees after considering the financial resources of each party. RCW 26.09.140. They may also award fees when one party's intransigence causes the other party to incur additional legal costs. In re Marriage of Foley, 84 Wn. App. 839, 846, 930 P.2d 929 (1997). Examples of intransigent conduct include foot-dragging, obstructionist behavior,

-16-

unnecessary motions, and attempts to run up legal costs. In re Marriage of Greenlee, 65 Wn. App. 703, 708, 829 P.2d 1120 (1992).

Cross claims that the court should have entered a judgment for $93,223.50; since the stock awards are community property and since she was awarded all of the community property, the court "made her pay [the money] to herself out of her share of the assets." Cross may be correct. Because, as discussed above, the trial court failed to properly characterize the unvested stock options, its award of attorney fees to Cross out of future unvested stock shares may have come out of Cross's share of the assets. Accordingly, we remand for the trial court to enter a judgment for Cross for her attorney fees.

F.    Joint Filing of Taxes

Cross next argues that the trial court abused its discretion by ordering her and Aronson to file their past-due income taxes for 2014 and 2015 jointly. We disagree.

The trial court ordered Aronson and Cross to cooperate in filing joint income tax returns for 2014 and 2015:

> The parties shall file Married Filing Jointly for tax years 2014 and 2015 using Respondent's physical address on the return. Both parties shall cooperate in providing CPA Simone Bachaud with any and all tax documents necessary to file said returns and shall cooperate in filing the same as soon as possible.

The court further ordered the parties to split the tax due on the past-due returns, but it made Aronson responsible for "100% of any interest, fees, and/or penalties due on any tax owed for these years." The court explained its decision requiring the parties to file joint returns because it would result in less taxes.

-17-

Cross argues that the trial court did not have the authority to order her to file a joint tax return. She relies on Bock v. Dalbey, 283 Neb. 994, 815 N.W.2d 530 (2012). Bock held that a trial court could not compel parties to file a joint tax return, reasoning the "critical factor" is that "[m]arried individuals filing joint returns expose themselves to joint and several liability for any fraudulent or erroneous aspect of the return." Bock, 815 N.W.2d at 534. But here, unlike Bock, the trial court removed any potential liability for Cross by ordering Aronson to pay "100% of any interest, fees, and/or penalties due on any tax owed for those years," including any penalties incurred as a result of Aronson not taking required distributions from his inherited IRAs. The trial court did not abuse its discretion in ordering Cross and Aronson to file a joint tax return.

G.    Contempt

Cross argues next that the court abused its discretion by holding her in contempt for filing her 2014 and 2015 taxes separately. We disagree.

"A court in a dissolution proceeding has the authority to enforce its decree in a contempt proceeding." Mathews, 70 Wn. App. at 126. Contempt means intentional "[d]isobediance of any lawful judgment, decree, order, or process of the court." RCW 7.21.010(1)(b). "Punishment for contempt of court is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion." Mathews, 70 Wn. App. at 126.

"In general, a court order that is "merely erroneous" must be obeyed and may not be collaterally attacked in a contempt proceeding." In re Estates of Smaldino, 151 Wn. App. 356, 366, 212 P.3d 579 (2009). Where a court lacks jurisdiction over the parties or the subject matter, or lacks the power to enter the order, its judgment is void. But when

-18-

a court has personal and subject matter jurisdiction, a procedural irregularity renders the judgment voidable—not subject to collateral attack. Smaldino, 151 Wn. App. at 366.

Here, the trial court did not abuse its discretion in holding Cross in contempt. By filing separately after the court ordered the parties to cooperate in filing jointly, Cross disobeyed the court's order. The court's order to enforce the decree did not inject ambiguity into the decree by conditioning the filing on Cross's approval. It merely specified that Cross was to comply with the decree—sign the returns prepared by the CPA. Even if the court's order was ambiguous or erroneous, since the court had jurisdiction over the matter, its order was voidable and not subject to collateral attack. Smaldino, 151 Wn. App. at 366. The trial court did not abuse its discretion in finding Cross in contempt.

## H.    Post-Secondary Education

Cross contends next that the trial court abused its discretion by failing to order Aronson to pay for all of their older son's post-secondary educational costs. We disagree.

In determining post-secondary support, a court must "determine whether the child is in fact dependent and is relying upon the parents for the reasonable necessities of life." RCW 26.19.090(2). The court may exercise its discretion in determining whether to award support and how long the support should last. RCW 26.19.090(2). It should consider factors including, but not limited to:

> Age of the child; the child's needs; the expectations of the parties for their children when the parents were together; the child's prospects, desires, aptitudes, abilities or disabilities; the nature of the postsecondary education sought; and the parents' level of education, standard of living, and current and future resources. Also to be considered are the amount

and type of support that the child would have been afforded if the parents had stayed together.

RCW 26.19.090(2). We review this decision for an abuse of discretion. In re Marriage of Shellenberger, 80 Wn. App. 71, 83, 906 P.2d 968 (1995).

At the time of dissolution the parties' eldest son, William, attended the University of Texas at Austin. The trial court ordered Aronson to pay all post-secondary expenses for William, "including but not limited to tuition, mandatory fees, books, room and board, or rent/utilities/food, transportation, and shall provide [a] debit card for the child to use for incidentals up to a cap of $30,000 per year (September 1 to September 1) commencing September 1, 2016." It ordered Aronson to pay all post-secondary expenses for July and August 2016. The revised order of child support kept these same parameters.

William attended UT Austin in the fall semester of 2016, but he did not attend the spring 2017 semester. Since William only attended half of the academic year, the court capped "Aronson's obligations for the fall 2016 semester" at "the half academic year rate of $15,000." And because Aronson had only paid $13,003.25 of that amount, the court entered a judgment against him for the remainder ($1,996.75).

Cross argues that the trial court's decision to not order Aronson to pay all of William's post-secondary expenses was an abuse of discretion. She points out, without providing citations to the record, that (1) William's college expenses were around $50,000 per year; (2) both parties agreed to pay for them; (3) William enjoyed a middle-class lifestyle when the parties were together; and (4) he was forced to work, take out a loan, and drop out of school for the spring 2017 semester. She also claims that "[i]n the

Reconsideration order, the court invented a new $15,000 per semester cap in place of the $30,000 annual cap." We disagree.

The trial court order requiring Aronson to pay all of William's post-secondary expenses up to $30,000 was reasonable: it balanced the parties' current and future resources with their standard of living and the child's needs. See RCW 26.19.090(2). Additionally, since William did not attend the spring 2017 semester, it was proper that Aronson only be required to pay $15,000, half of $30,000. The trial court did not abuse its discretion.

<em>Aronson's Cross Appeal</em>

Aronson raises three issues in his cross appeal. We address each in turn.

## A.  Future Stock Awards

Aronson first contends that the court abused its discretion by awarding Cross half of any future stock awards that he may receive. We disagree.

"The trial court's distribution of property in a dissolution action is guided by statute." In re Marriage of Rockwell, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). The court must consider: "(1) the nature and extent of the community property, (2) the nature and extent of the separate property, (3) the duration of the marriage, and (4) the economic circumstances of each spouse at the time the division of the property is to become effective." RCW 26.09.080. In considering these factors, the court must make a "just and equitable" distribution of the parties' property and liabilities, whether community or separate. RCW 26.09.080. All property, both separate and community, is brought before the court for distribution. Farmer v. Farmer, 172 Wn.2d 616, 625, 259 P.3d 256 (2011). The trial court is in the best position to decide issues of fairness.

-21-

Brewer v. Brewer, 137 Wn.2d 756, 769, 976 P.2d 102 (1999). Accordingly, the court has "broad discretion" to determine what is just and equitable based on the circumstances of each case. Rockwell, 141 Wn. App. at 242. "A property division made during the dissolution of a marriage will be reversed on appeal only if there is a manifest abuse of discretion." Muhammad, 153 Wn.2d at 803.

Aronson fails to meet his high burden of proof. The record demonstrates that the trial court carefully considered the relevant statutory factors and the circumstances of each spouse. Aronson and Cross had been together for 23 years and had been married for over 20 years. Dividing future stock awards evenly between the two cannot be considered an abuse of discretion.

B.    Increased Maintenance After Child Support Obligations End

Aronson argues next that the court erred by increasing maintenance after the child support obligations end. We disagree.

At the outset, nothing prevents a trial court from considering child support obligations in setting maintenance. Indeed, RCW 26.09.090(1)(a) "directs a trial court to calculate the need for spousal maintenance only after it has determined the parties' child support obligations." Wilson v. Wilson, 165 Wn. App. 333, 342, 267 P.3d 485 (2011). Consequently, it is not an abuse of discretion for the trial court to increase the maintenance award after the paying spouse's obligation to pay child support end. Moreover, because the trial court here reserved its determination until after Tomm graduates from high school or turns 18, Aronson's challenge is premature.

C.    529 Funds

Aronson argues finally that the trial court erred by requiring him to reimburse William's 529 educational account.  We disagree.

William had a 529 college savings account in his name.  After Aronson petitioned for dissolution but before trial, the court entered a temporary order enjoining the parties from "transferring, removing, encumbering, concealing or in any way disposing of any property except in the usual course of business or for the necessities of life."

On May 17, 2016, after trial and one day before the court issued its oral ruling, Aronson withdrew all of the money from William's 529 account ($11,890.44) and used it to pay William's summer tuition at the University of Texas.  Aronson withdrew the money on May 17, but tendered payment on May 26.  It is undisputed that Aronson paid William's tuition.

On May 18, the court ruled orally that Cross should manage the 529 accounts:

> Similarly, I think that [Cross] should be awarded the 529 accounts for the boys.  Obviously the money is for their education, and she's not supposed to spend it on something else.  But, again, she—it's easier—we're going to get more of a straightforward from [Cross] on this than we had from [Aronson].  So I want to put her in charge of that.

The decree (entered June 30, 2016) ordered Aronson to transfer all college-savings accounts to Cross within 10 days.  These accounts were not transferred, and in February 2017, Cross moved the court to hold Aronson in contempt for failing to transfer them.

In its contempt order of March 22, the court ordered Aronson to transfer all of the 529 accounts to Cross immediately and "re-establish a 529 account for William with at least $11,890.44 in it" within 30 days of the close of his father's estate.  It explained:

And I—I understand that you used it for his college expenses. I don't think that it was a legitimate—I understand why you did at the time because you didn't have the cash available. But I don't—but it wasn't contemplated by my decision that you were going to use the funds that came from your father to William in his 529 to pay for his immediate tuition for the summer. And so I'm ruling that you need to reimburse William for that. Now you probably won't be able to do that until you get money from your father's estate because you won't have money to do it until then. But I think you need to give William back money that was in his 529 from your father.

On March 31, Cross moved the court to reconsider its contempt orders of March 22. She requested the court enter a judgment for $11,890.44 instead of order Aronson to open a new 529 account. The court denied this motion.

Aronson argues that ordering him to reimburse $11,890.44 in 529 funds was error because he used those funds to pay for William's tuition. We disagree.

Here, the court correctly ordered Aronson to reimburse $11,890.44 to William's 529 account: the court orally ruled that Cross should be "in charge of" the 529 accounts, and Aronson disobeyed that ruling when he exerted control over William's 529 account by tendering a tuition payment after the court issued its oral ruling. The court's ruling did not contemplate that Aronson would be managing payments from William's 529 account. ("I understand why you did at the time because you didn't have the cash available. But I don't—but it wasn't contemplated by my decision that you were going to use the funds that came from your father to William in his 529 to pay for his immediate tuition for the summer."). The trial court did not err.

*Attorney Fees*

Both Aronson and Cross request their attorney fees on appeal. RAP 18.1 allows this court to award attorney fees if authorized by an applicable law. RCW 26.09.140 provides for attorney fees on appeal. In exercising discretion under this statute, the

court considers "the arguable merit of the issues on appeal and the parties' financial resources." In re Marriage of Raskob, 183 Wn. App. 503, 520, 334 P.3d 30 (2014). We decline to award either party attorney fees on appeal.

## CONCLUSION

We remand to the trial court to recharacterize the Microsoft stock awards and enter a judgment against Aronson for Cross's attorney fees. In all other respects, we affirm.

Mann, A.C.J.

WE CONCUR:

Trickey, J.

Schindler, J.