# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| In re the Marriage of:<br><br>JENNIFER TISDEL SCHORSCH,<br><br>    Respondent,<br><br>and<br><br>KEITH MARTIN SCHORSCH,<br><br>    Appellant. | No. 85268-0-I<br><br>ORDER GRANTING MOTION TO DISMISS, DENYING MOTION FOR RECONSIDERATION, DENYING MOTION TO PUBLISH, AND DENYING MOTION TO REMOVE ITEMS FROM THE COURT'S WEBSITE |

Based on the parties' settlement of their dispute, appellant Keith Schorsch and respondent Jennifer Schorsch jointly move to dismiss the appeal. The parties further request that the court remove from its website the briefing, oral argument recording, and opinion in this matter. Additionally, Keith Schorsch requests that the court permit him to withdraw his pending motions for reconsideration and to publish, and Jennifer Schorsch does not oppose that request.

We grant the motion to dismiss the appeal and, based on that ruling, deny the motions for reconsideration and to publish as moot and vacate the opinion in this matter. The parties provide no authority for their argument that the court can properly remove from its website documents or other materials that have not been filed under seal. "Where no authorities are cited in support of a proposition, we are not required to

search out authorities but may assume that counsel, after a diligent search, has found none." *Seattle Bulk Shipping, Inc. v. Dep't of Labor & Indus.*, 25 Wn. App. 2d 762, 778, 524 P.3d 733 (2023). Accordingly, this request for relief is denied.

Feldman, J.
_____
Judge

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In re the Marriage of: | No. 85268-0-I |
| JENNIFER TISDEL SCHORSCH, | DIVISION ONE |
| Respondent, | UNPUBLISHED OPINION |
| and | |
| KEITH MARTIN SCHORSCH, | |
| Appellant. | |

FELDMAN, J. — Keith Schorsch appeals various orders issued by the trial court in a dissolution of marriage proceeding involving his ex-spouse, Jennifer Schorsch.[1] On appeal, Keith challenges several of the trial court's findings, conclusions, and orders regarding spousal maintenance, child support, property division, and the award of attorney fees to Jennifer. We agree with Keith's arguments that the trial court erred by (a) ordering the parties to submit child support disputes to arbitration, (b) imposing seemingly conflicting educational requirements for the parties' children to receive postsecondary educational support, (c) imposing seemingly conflicting termination dates for postsecondary educational support, and (d) failing to properly assign a value to the Seattle Tennis

---

[1] Because Keith and Jennifer have the same last name, we refer to them by their first names for clarity.

Club (STC) membership and include this asset among the community property divided between the parties. We reject each of Keith's remaining arguments. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I

Keith and Jennifer met at Harvard Business School in the 1990s and were married in 1999. After Jennifer graduated, she worked at Starbucks from 1992 to 2000 and attained the position of regional vice president. The couple's first son, B,[2] was born in 2000, at which point Jennifer left her job at Starbucks to care for him at home, which she continued to do after their second son, S, was born in 2002. In 2006, Jennifer began working at Keith's online health company, Trusera, until it wound down in 2009. In 2011, Jennifer began another job as the chief marketing officer at a nonprofit organization, Water.org, and eventually became its president, earning a salary as high as $267,000. Jennifer's position at Water.org was eliminated in November 2021, and she was unemployed when the trial court entered its final orders in this matter. While the parties' dissolution of marriage action was pending, Jennifer applied for a development officer role with Seattle Children's Hospital and was a finalist for the position, but she was ultimately not hired.

After Keith graduated from business school, he worked as an executive at several companies, including as a manager of finance at US West Cellular, a division chief financial officer at McCaw Cellular (which later merged with AT&T),

_____

[2] To protect the children's privacy, we use their initial in place of their name.

and a finance leader and general manager at Amazon. After resigning from Amazon, Keith founded multiple start-up businesses, including Trusera and an investment firm, Schorsch Ventures LLC. Between 2010 and 2021, Keith worked as the chief financial officer (CFO) for several other companies. Outside of work, Keith served as the chief business officer for the Global Good Fund and served on the boards of the Seattle Children's Foundation and the Fred Hutchinson Cancer Research Center. Most recently, Keith worked as the CFO for RPI Print from September 2020 to February 2021, where his annual salary exceeded $320,000. Throughout Keith's employment history, he has consistently received a six-figure income.

Throughout his career, Keith has struggled with mental health issues. He has experienced depression and anxiety since he was in undergraduate school in the late 1980s, and he has been diagnosed with major depressive disorder and dysthymia. In 2004, Keith contracted Lyme Disease, which caused "brain fog," "memory issues," and "processing issues." In the early 2010s, Keith was also diagnosed with bipolar disorder. Keith underwent electroconvulsive therapy to treat his depression in 2014. In October 2020, Keith fell down a flight of stairs at the parties' home and hit his head against the wall. Keith experienced concussion-like symptoms as a result of the fall, and he was later diagnosed with a traumatic brain injury (TBI). At the time of trial, Keith was unemployed.

In December 2020, the parties were "extremely unhappy" and believed they "should separate" if they "couldn't figure out a way to be happy." On February 8, 2021, Keith moved out of the parties' house in Seattle (the Seattle Home) and moved into their house on Vashon Island (the Vashon Home). After Keith argued

with Jennifer and the children on Easter about his aggressive spending of the parties' money, Jennifer told Keith she would be pursuing legal separation. The parties were unable to amicably resolve their differences, and Jennifer filed a petition for legal separation on July 22, 2021.

After moving to the Vashon Home, Keith spent hundreds of thousands of dollars from the parties' primary joint account over Jennifer's protestations to pay off his credit card debt, remodel the Vashon Home, and purchase a vast quantity of personal property (including vehicles, art, furniture, antiques, and other miscellaneous items) to allegedly start a new business. Keith told the person who sold him much of this property that he was in a "dispute with his wife" and was purchasing this property because "she can't get my money if I spend it all." Keith also transferred over $150,000 from the parties' joint account to his individual account. In response to Keith's rapid depletion of the parties' community funds, Jennifer transferred $402,000 from the community account into a new brokerage account in June 2021 and used this account to continue paying the parties' community expenses, such as the mortgages, taxes, and children's tuition. By August 2021, Keith had depleted the $502,000 that Jennifer left in the community account to about $40,000.

Keith's mental health began deteriorating in the summer of 2021 after he stopped taking his prescribed medication. In October 2021, Keith stopped communicating with his psychologist, Dr. Andrew Benjamin, and in November 2021 he was drinking more and feeling isolated and depressed. At the end of November, Keith had an "acute manic psychotic break" and was involuntarily hospitalized until early December 2021. After he was discharged, his psychiatrist,

Dr. David Dunner, changed his diagnosis to bipolar type 1 disorder and prescribed mood stabilizers. Jennifer noticed that Keith "was doing well" in early 2022 when he was receiving medical care and taking his medications.

After a five-day bench trial at the end of 2022, the trial court issued its final orders on March 27, 2023. Of the total community property approximating $3.5 million, the trial court awarded Keith a 55 percent share "due to his current cognitive and emotional abilities currently and in the near future." However, the trial court treated $644,509 as "a pre-distribution of the community funds" to Keith due to his waste of the marital community following separation. The court also denied Keith's request for spousal maintenance. Additionally, the court ordered the parties to establish a trust to pay for the children's postsecondary education and fund it with $300,000 from the parties' community property. The trial court also ordered the parties to pay child support to their two children. Finally, the court ordered Keith to pay Jennifer attorney fees totaling $75,000 due to his intransigence and discovery violations during litigation. Keith appeals.

II

Although many of Keith's arguments are conclusory, unsupported, and/or incoherent, we have identified various discrete arguments, some of which are presented in disparate portions of the briefing, and we accordingly address those

arguments below. We decline to address the remaining arguments, which are not presented in accordance with the Court's rules.[3]

## A. Post-trial submissions

Keith argues the trial court abused its discretion by "considering additional 'evidence' without reopening the case" after the trial had concluded. (Emphasis omitted). We disagree.

"[T]he reopening of a cause for additional evidence is within the discretion of the trial court and . . . the trial court's actions in this regard will not be reversed except upon a showing of an abuse of discretion and prejudice resulting to the complaining party*." Estes v. Hopp*, 73 Wn.2d 263, 270, 438 P.2d 205 (1968). A court may allow a party to reopen the cause if the court is "confused by the state of the evidence." *Powell v. Schultz*, 4 Wn. App. 213, 215-16, 481 P.2d 12 (1971). "A trial court is not so helpless that it must decide a controversy upon a record which is, in the court's opinion, incomplete for want of available evidence proper to be received, the admission of which would render the court better able to do justice between the parties." *Ankeny v. Pomeroy Grain Growers, Inc.*, 170 Wash. 1, 10, 15 P.2d 264 (1932).

Here, after the trial concluded, the trial court presented drafts of its final orders to the parties and asked them to "review the draft orders and to be ready to

---

[3] Among other deficiencies, the argument headings and page numbers set forth in the table of contents and table of authorities do not correspond with the body of the brief. Keith lists 36 assignments of error but fails to elaborate on many of them in the body of his briefs. Keith often raises the same or similar arguments in piecemeal fashion in different sections of his briefs. Many of Keith's arguments fail to cite to the record or legal authority, and Keith cites to exhibits that are not included in the record on appeal. When Keith does cite legal authority for a proposition, the authority upon which he relies is often unrelated to that proposition. For virtually all of Keith's arguments, he fails to explain how the trial court erred, how he was prejudiced by the alleged error, or what remedy he is seeking. Finally, neither Keith's opening brief nor his reply brief contain a conclusion setting forth the precise relief sought as required by RAP 10.3(a)(7) and (c).

alert [the court] to scrivener errors, community property which [the court] may have inadvertently failed to include in the orders and spreadsheet, requests for changes to the orders based on logistical ease as opposed to substantive reasons, etc." In response, Jennifer submitted an updated statement of assets and liabilities showing the "current balance as of 3/9/2023" for the parties' community accounts. Jennifer's submission also traced $34,931 in these accounts to the sale of certain items of property that Keith had purchased after the separation date and asked the court to exclude that amount from the division of community property "to ensure [Keith] retains 100% of the sale proceeds from the property he purchased." Jennifer later filed a supplemental declaration alerting the court that its draft orders did not include a child support order and suggesting that the court calculate the parties' income for child support purposes based on the "average rate of return" of 8.29 percent on the investment assets each party would receive upon dissolution, given that both parties were unemployed. Following a hearing, the trial court adopted Jennifer's proposals. The trial court did not abuse its discretion in considering this information for the limited purpose of more accurately crafting its final orders regarding property division and child support.

Additionally, Keith has failed to show prejudice. At trial, Keith did not seriously dispute the accuracy of Jennifer's newly submitted information or argue that he was prejudiced by the court's consideration of it. Keith fails to make these showings on appeal as well, and he does not articulate what remedy we should impose to correct these alleged errors. Instead, his counsel suggested at oral argument that we apply a newly-fashioned "cumulative error" doctrine and view all

of the trial court's rulings skeptically.[4] No case law supports that novel approach, which is contrary to the established standards that govern our review of trial court decisions. Thus, even assuming the trial court abused its discretion in considering this evidence, Keith has not demonstrated the requisite prejudice to warrant reversal.

Keith argues the trial court's consideration of this evidence was erroneous under our holding in *In re Welfare of Ott*, 37 Wn. App. 234, 240, 679 P.2d 372 (1984). In that case, we affirmed the trial court's denial of a party's motion to re-open the cause to allow the party to "retestify concerning his relationship to his children, his housing arrangements, and other matters." *Id.* We declined to find an abuse of discretion because "[t]here had been extensive testimony" from the moving party and other witnesses regarding these issues, and the moving party had "suffered no prejudice" from the denial of the motion. *Id. Ott* is distinguishable because the trial court here accepted Jennifer's submissions to clarify details about the division of property and calculation of child support.[5]

Keith also contends the trial court erred because it did not formally reopen the cause before considering this evidence, which Keith avers would have allowed him to raise substantive objections to the evidence. This argument fails because at no point below did Keith raise the evidentiary objections he now proffers on

---

[4] Wash. Ct. of Appeals oral argument, *In re Marriage of Schorsch*, No. 85268-0-I (July 12, 2024), at 1 min., 5 sec. to 2 min., 42 sec. (on file with court).

[5] Keith's reliance on the Maryland Court of Appeals' decision in *Dyson v. State*, 328 Md. 490, 500, 615 A.2d 1182 (Md. Ct. App. 1992)—which is nonbinding on our court—is misplaced because it involved a criminal jury trial. The risk of unfair prejudice in presenting the jury with new evidence after it has begun its deliberations is far greater than presenting the trial court in a dissolution proceeding with additional information to more accurately craft its final orders. *See Ankeny*, 170 Wn. at 10.

appeal as bases to exclude this evidence, such as lack of authentication, lack of foundation, hearsay, relevance, and failure to testify under penalty of perjury. Moreover, the trial court indicated to Keith's attorney at the hearing that it was "open to substantive arguments to a limited extent" to address "information pertaining to the child support order" that the court inadvertently omitted from its draft orders. Thus, Keith had an opportunity to raise evidentiary objections, yet failed to do so. For these reasons, we reject Keith's argument.

## B.     Spousal maintenance

Keith argues the trial court abused its discretion by declining to award him spousal maintenance. We disagree.

A party does not have an inherent right to receive maintenance. *In re Marriage of Mueller*, 140 Wn. App. 498, 510, 167 P.3d 568 (2007). Instead, a court in a dissolution proceeding "may" grant maintenance to either spouse "in such amounts and for such periods of time as the court deems just, without regard to misconduct, after considering all relevant factors including but not limited to" the following:

> (a)     The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently . . . ;
>
> (b)     The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;
>
> (c)     The standard of living established during the marriage . . . ;
>
> (d)     The duration of the marriage . . . ;

       (e)     The age, physical and emotional condition, and financial obligations of the spouse . . . seeking maintenance; and

       (f)     The ability of the spouse . . . from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse . . . seeking maintenance.

RCW 26.09.090(1). While a trial court is not required to make specific factual findings on these factors, it must consider each of them in determining whether to award maintenance. *In re Marriage of Anthony*, 9 Wn. App. 2d 555, 564, 446 P.3d 635 (2019).

So long as a trial court considers each of these factors, it exercises broad discretionary powers in determining whether to award maintenance, and we review this determination for manifest abuse of discretion. *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984). A trial court abuses its discretion if it does not base its maintenance ruling "upon a fair consideration of the statutory factors" listed in RCW 26.09.090. *In re Marriage of Crosetto*, 82 Wn. App. 545, 558-59, 918 P.2d 954 (1996). "Where the trial court has weighed the evidence, the reviewing court's role is simply to determine whether substantial evidence supports the findings of fact, and if so, whether the findings in turn support the trial court's conclusions of law." *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). In reviewing findings, we view the record in the light most favorable to the party in whose favor the findings were entered, and we do not substitute our judgment for the trial court's, reweigh the evidence, or adjudge witness credibility. *In re Marriage of Kaplan*, 4 Wn. App. 2d 466, 479, 421 P.3d 1046 (2018).

For the reasons that follow, we conclude the trial court did not abuse its discretion by denying Keith maintenance because it fairly considered each of the six statutory maintenance factors under RCW 26.09.090(1)(a)-(f).

1. **Keith's financial resources, including separate or community property apportioned to him, and his ability to meet his needs independently**

The trial court found, "Both parties will have considerably fewer financial resources than what they were used to during their marriage, but each will receive assets valued at close to or more than $2 million – an amount that will allow them to meet their needs independently." Additionally, the trial court considered that Keith would receive a "higher distribution of community property"—55 percent of the parties' community property as compared to Jennifer's 45 percent. Substantial evidence supports these findings. After accounting for the $644,509 predistribution of community property to Keith, the record shows that he received additional community property worth over $1.5 million and separate property worth over $270,000.

2. **The time necessary to acquire sufficient education or training to enable Keith to find employment appropriate to his skill, interests, style of life, and other attendant circumstances**

Addressing this factor, the trial court found that "[b]oth parties are extremely educated, have a past high level of employment, and significant skills. Neither party needs time to obtain further education or training." On appeal, Keith argues this "conclusion is not supported by adequate finding [sic] and not supported by substantial evidence" because "everyone who testified about [Keith's] condition agree[s] [he] needs services and time if he is to become employable." This argument fails because Keith conflates receiving "education or training" with

receiving "services and time" to treat his mental health issues and does not cite any legal authority suggesting the latter should be considered under RCW 26.09.090(1)(b).

### 3. The standard of living established during the marriage

As to this third factor, the trial court found, "Both parties will have to readjust their standards of living that they maintained during the marriage. Still, in light of the separate and community property each party will be apportioned, each party will still be able to maintain a high standard of living." Keith argues on appeal that the court "did not consider [his] financial obligations it was simultaneously requiring him to pay like 45% of the children's $15,300 monthly living and postsecondary education expenses ($400,000 over the next 6 years) or [Keith's] modest $7,000 per month in living expenses ($500,000 over the next 6 years)." Keith's argument fails because he ignores that a trust funded with $300,000 will be paying the majority of the children's expenses, as discussed in part II(C)(1) below. Jennifer provided estimates at trial indicating that, after accounting for expenses paid by the trust, the parties will be responsible for paying approximately $2,925 per month in expenses for the children, of which Keith will be responsible for paying 45 percent—a much smaller figure than Keith claims he will be paying.

### 4. The duration of the marriage

Regarding this fourth factor, the trial court found that the marriage "extended for over 20 years" and was "long-term." Keith appears to concede in his reply brief that the trial court fairly considered this factor. Nevertheless, Keith's argument in his opening brief that "the trial court must consider equalization [of the parties' future economic circumstances] or it erroneously fails to exercise discretion" fails

because the case he cites in support of this argument does not discuss spousal maintenance and is, thus, inapposite. *See Rockwell*, 141 Wn. App. at 248 (stating that the trial court's objective in dividing property when dissolving long-term marriages "is to put the parties in roughly equal financial positions for the rest of their lives"). To the extent *Rockwell* applies to spousal maintenance, Keith's argument still fails because we recently distinguished *Rockwell* in *Kaplan*, where we held that "[a]n objective of placing the parties to a long-term marriage in roughly equal financial positions is not a mandate for trial courts to predict the future, divide assets with mathematical precision, or guarantee future equality." *Kaplan*, 4 Wn. App. 2d at 475-76 (internal quotation marks omitted). The trial court fairly considered this factor.

### 5. Keith's age, physical and emotional condition, and financial obligations

Keith argues the trial court "improperly considered" this fifth factor under RCW 26.09.090(1)(e) because he is "unemployable" due to his mental health issues. We disagree.

At trial, Keith presented testimony from two experts regarding his employability. First, Keith elicited testimony from Dr. Richard Adler, his treating psychiatrist, who performed neuropsychological screening tests on Keith in August 2021 and October 2022. Dr. Adler opined that Keith suffered a TBI that is contributing to his compromised executive functioning. Dr. Adler testified that while Keith is not presently employable, he could make significant improvement towards obtaining employment in a year if he continues receiving treatment and taking his medications. Second, Keith elicited testimony from Dr. Benjamin, his former

treating psychologist, that he experienced changes in behavior due to injuries he sustained following his fall in October 2020 and in a motor vehicle accident in June 2021. These changes include confusion, difficulty looking at screens for extended periods of time, and difficulty organizing, planning, and problem solving. Dr. Benjamin agreed with Dr. Adler that Keith has a "degenerative brain disease." As for Keith's employment prospects, Dr. Benjamin opined that Keith is presently unemployable but could be reemployed in "a couple years."

In response, Jennifer presented expert testimony from Dr. Craig Beaver, who, unlike Keith's experts, is a neuropsychologist specializing in assessing "neuro cognitive abilities" and rehabilitating individuals with neurological issues, which includes determining whether "they [are] ready to go back to work or school" and "what accommodations they need." Dr. Beaver opined that on a more probable than not basis Keith has "the capacity to become employed" if he receives treatment for his mental health issues such as counseling, speech therapy, and medication. Dr. Beaver estimated that Keith could "begin pursuing vocational options" within six months after trial. Dr. Beaver disagreed with the claims of Keith's experts that he has a "significant neurodegenerative disorder" and observed that Keith performed "in the average to high average range of abilities" in neuropsychological exams in 2008 and 2015, during which time he was employed in well-paying jobs despite experiencing ongoing mental health issues. In forming his opinions, Dr. Beaver relied on testing performed on Keith in April 2022 by another neuropsychologist, Dr. Myron Goldberg, which indicated that Keith has "average to well above average ability in most cognitive areas," that his cognitive recovery from the TBI he suffered in October 2020 is "quite favorable,"

and that it is "unlikely" Keith will experience "persistent appreciable declines in his cognitive functioning" from this injury.

The trial court made several findings regarding Keith's employability. The court found "there is substantial evidence that [Keith] has struggled considerably with mental health issues which have likely interfered with his ability to obtain and to retain employment in the past two years." The court "considered [Keith's] ability to maintain high levels of employment throughout his multiple bouts of significant depression over the past few decades." The court also found that Keith "would likely not be employable, in any capacity, for the next few months." But the court further found, "Based on the totality of evidence, including Dr. Craig Beaver's testimony, [Keith] will likely be employable after [] several months but it is unclear when and what type of employment [Keith] will be able to obtain." Lastly, the court stated that Keith "is not currently employable and will likely not be able to obtain the level of employment he previously had. Nonetheless, the Court cannot conclude that [Keith] will not be able to obtain some type of employment in the future."

Substantial evidence supports these findings. All of the experts agreed that Keith, while not presently employable, could regain employment in the future if he continues receiving treatment for his mental health issues. Drs. Adler and Benjamin testified that it was possible for Keith to regain employment in the future, albeit on a longer timeframe than Dr. Beaver predicted. At bottom, Keith asks us to place greater weight on the opinions of his experts than those of Jennifer's experts, but this approach runs counter to our deferential standard of review. *See Rockwell*, 141 Wn. App. at 248 ("If a trial court's finding is within the range of the

credible evidence, we defer.").  On this record, we conclude the trial court fairly considered Keith's age, physical condition, and financial obligations in determining whether to award him maintenance.[6]

Notwithstanding the foregoing analysis, Keith claims the trial court showed "improper disdain for [Keith's] behavior caused by mental health challenges and gender" by placing greater weight on its and Jennifer's own lay opinions of Keith's employability rather than the experts' opinions on that issue.  In support of this assertion, Keith relies heavily on our decision in *In re Marriage of Leaver*, 20 Wn. App. 2d 228, 499 P.3d 222 (2021).  In *Leaver*, the trial court awarded maintenance to husband for two years but declined to award him lifetime maintenance because, relying on wife's "lay opinion," the trial court found that there was "a lot more" he "could do if he put his mind to it" to find employment.  *Id.* at 240.  On appeal, we held that this decision was not supported by substantial evidence because the trial court disregarded expert testimony from husband's psychiatrist and neuropsychological evaluator, who testified that husband was disabled due to his depression and anxiety and had poor employment prospects.  *Id.* at 239-40.

*Leaver* is distinguishable because Jennifer presented expert testimony from Dr. Beaver, who in turn relied on the opinions of Dr. Goldberg, that Keith could become employable in the future.  Moreover, the trial court's finding that Keith was able to testify "articulately, responsively, and comprehensively" at trial was supported by the opinions of Dr. Beaver, who also watched Keith testify and

---

[6] Jennifer also contends that Keith may be eligible for government benefits such as unemployment or disability.  While the record does not indicate whether and to what extent Keith could receive such benefits, he does not dispute on appeal that he has not applied for these benefits even though they could provide another source of income should he continue to remain unemployed due to his health issues.

observed that he "presented better than what I expected," had a "remarkable ability to pull up facts and dates and information," and "seemed reasonable and logical" when testifying. By basing its findings on expert testimony, the trial court did what *Leaver* requires.[7]

Additionally, Keith argues the trial court, in denying spousal maintenance, improperly considered his "misconduct" that was the result of "mental health challenges," which "may have caused him to engage in behavior the trial court disdained." This argument fails because nothing in the trial court's findings or conclusions regarding maintenance indicates that it declined to award maintenance to Keith based on conduct that the court deemed improper. We therefore reject Keith's arguments regarding this factor.

### 6. Jennifer's ability to meet her needs and financial obligations while meeting those of Keith

As to this last factor, Keith argues the trial court erred by finding that Jennifer cannot meet her needs and financial obligations if ordered to pay maintenance to Keith. We disagree.

In determining spousal maintenance, "a trial court must consider a requesting spouse's need for support." *In re Marriage of Wilcox*, 553 P.3d 614, 617 (Wash. 2024). Here, the trial court made several findings regarding Jennifer's efforts and ability to obtain employment. The trial court found that Jennifer, after losing her job at Water.org, "has acted in good faith when seeking new employment but, as of the time of trial, has been unsuccessful. Due to her active

---

[7] Keith's reliance on our unpublished opinion in *In re Marriage of Rich*, No. 83365-1-I (Wash. Ct. App. June 20, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/833651.pdf, is misplaced for the same reason.

but unsuccessful efforts in finding employment, it would call for a certain degree of speculation on the part of the Court to determine when she will find employment and at what compensation." Additionally, the court found that Jennifer, after separation, "spent a considerable number of hours working diligently to enhance the value of the community estate through her efforts to sell the Seattle and Vashon homes." The court ultimately concluded that because Jennifer "has not worked since 2021 and has not been able to secure employment, the Court cannot speculate that she will be able to meet her needs if required to pay spousal maintenance."

Substantial evidence supports the trial court's findings regarding Jennifer's efforts to obtain employment and her inability to pay maintenance to Keith. After filing for separation in July 2021, Jennifer maintained her employment with Water.org until November 2021. Jennifer then spent several months applying and interviewing for a position at Seattle Children's Hospital commensurate with her prior level of employment. Additionally, Jennifer spent considerable time and effort caring for the marital community during dissolution proceedings. She preserved the parties' community property from being depleted by Keith's excessive spending, paid the parties' and children's expenses (despite Keith's frequent efforts to hinder her ability to pay these expenses), cared for the parties' children who were living with her at various times after separation, and generated hundreds of thousands of dollars for the marital community in preparing two of the parties' homes for sale. Jennifer also assisted Keith in obtaining medical care after he was discharged from the hospital in December 2021.

Keith claims the trial court "improperly refused, as speculative, to determine [Jennifer's] *ability* to earn income" in contravention of our holding in *Anthony*, 9 Wn. App. 2d at 566. In *Anthony*, we affirmed the trial court's award of maintenance to wife but remanded because the trial court did not make findings as to husband's income, despite having "real numbers," and did not consider his ability to pay maintenance or his needs and financial obligations under RCW 26.09.090(1)(f). *Id.* at 566-68. *Anthony* is distinguishable because the trial court here made such findings regarding the parties' incomes (they were both unemployed) and considered Jennifer's inability to pay maintenance and her needs and financial obligations. Moreover, neither *Anthony* nor any other authority cited by Keith requires a court to impute income to an unemployed spouse for purposes of awarding spousal maintenance to the other spouse.

### 7. Summary of RCW 26.09.090 factors

In sum, the trial court fairly considered the RCW 26.09.090 factors in denying maintenance to Keith. The court found that Keith would receive a greater share of the community property and would be left with well over $1 million to support himself, that he could become employable again in the future, and that Jennifer is unable to pay maintenance while also meeting her present needs. Because these findings are supported by substantial evidence, the trial court did not abuse its discretion in denying maintenance to Keith.

## C. Child support

Keith raises several arguments relating to the trial court's rulings regarding child support. We review a trial court's child support rulings for manifest abuse of discretion. *Kaplan*, 4 Wn. App. 2d at 484. Notwithstanding this deferential

standard of review, we agree with Keith that remand is necessary for the trial court to strike the arbitration provision in the child support order and clarify other aspects of the trial court's child support rulings. We reject each of Keith's remaining arguments regarding child support.

### 1. Trust and 529 plans

Keith argues the trial court erred when it "found that the parties have a community debt to their two sons creating an obligation to restore funds to the two 529 savings accounts" by creating a trust to pay for the children's postsecondary educational expenses.[8] We disagree.

During the marriage, the parties funded 529 plans for their children that totaled $468,551 in 2018. In the years that followed, the parties drew funds from the 529 plans to pay the mortgages and other expenses on their real estate after they purchased a new house before their existing house had sold. When the parties separated in February 2021, approximately $90,000 remained in the 529 plans. By the time of trial, B's 529 plan had some funds remaining in it, but S's 529 plan had been depleted. Both parties testified at trial that they desired to form a trust to pay for their children's postsecondary education. Jennifer asked the trial court to order Keith to pay $170,000 into a trust for the children "because it represents what we had intended to do before, which is to set aside funds for their 529 plan." In response, Keith testified that he intended to establish a trust "with

---

[8] 529 plans, also known as "qualified tuition programs," are tax-advantaged savings plans designed to encourage parents to save money for their children's future education expenses. *See* 26 U.S.C. § 529.

[$]50,000 for each boy," but he preferred that his trust be separate from Jennifer's trust.

In its final orders, the trial court ordered the parties to establish an "Education and Health Care Trust" in the amount of $300,000. The court explained that "[t]he funding of the trust is required because the parties used funding from the 529 account to previously meet the expenses of three mortgages" and "[t]he parties owe a debt to the children for removing these funds in the first place." The trial court further stated, "Based on the parties' understanding and agreement when they withdrew the funds from the sons' 529 savings accounts, the trial court finds that the parties have a community debt to the sons and obligation to restore the funds to these accounts." Lastly, the court found that establishing this trust "is both equitable and consistent with the family's historic priorities to restore the funding close to what was" in the 529 plans.

On this record, the trial court did not abuse its discretion by ordering the parties to create and fund this trust to pay for the children's postsecondary educational expenses. Both parties acknowledged they have an obligation to their children to pay for some portion of the children's education, and both parties agreed that a trust was the proper vehicle by which to accomplish this goal. They only disagreed on the structure of the trust and the amount of funds that should be held in trust. The trial court's decision to order the parties to create and fund the trust in the manner it did was just and equitable under these circumstances. *See* RCW 26.09.080 (trial court shall dispose of property and liabilities "as shall appear just and equitable"); *In re Marriage of Cota*, 177 Wn. App. 527, 536, 312 P.3d 695

(2013) ("The trial court has broad discretion to order support for postsecondary education.").[9]

## 2.   Ordering child support beyond age 23

Keith argues that the trial court abused its discretion "when it ordered support for the adult children beyond 23."  We disagree.

"When considering whether to order support for postsecondary educational expenses, the court shall determine whether the child is in fact dependent and is relying upon the parents for the reasonable necessities of life."  RCW 26.19.090(2). Trial courts have discretion to determine "whether and for how long to award postsecondary educational support."  *Id.*  In making this determination, the trial court considers factors such as the "[a]ge of the child; the child's needs; the expectations of the parties for their children when their parents were together; the child's prospects, desires, aptitudes, abilities or disabilities; the nature of the postsecondary education sought; and the parents' level of education, standard of living, and current and future resources. . . . [and] the amount and type of support that the child would have been afforded if the parents had stayed together."  RCW 26.19.090(2).   Additionally, the trial court "shall not order the payment of postsecondary educational expenses beyond the child's twenty-third birthday, except for exceptional circumstances, such as mental, physical, or emotional disabilities."  RCW 26.19.090(5).

---

[9] Keith cites several cases from other jurisdictions in support of his contention that "[p]arents are under no obligation to spend the money in a 529 Savings Plan on the educational expenses of the children listed as the plan beneficiaries" and "absent some additional actions by the parents to restrict the use of the 529 Savings Plan funds, those funds are solely the property of the parents." These cases do not change our analysis because they do not analyze Washington law, and Keith does not explain how we should apply the legal principles derived from these cases to Washington's statutory framework governing the division of community property and child support.

Here, the trial court made the following findings regarding postsecondary educational support:

1. The parties' sons, ages 20 and 22, while no longer minors, are both attending college, and are dependent on their parents for support.

2. [S], age 20, is in his second year at Davidson College. [B], age 22, is enrolled in his first year at Western Washington University.

3. Both sons have demonstrated ability and aptitude to pursue their post-secondary education and are studying toward a degree in their identified academic and career areas of interest. They will require financial support from their parents.

4. Both sons have disabilities that require ongoing support . . . .

5. The court finds credible the testimony presented regarding both sons' special needs. [S] is on the Autism spectrum. [B] has worked through debilitating anxiety and depression for the past seven years and is receiving treatment for bipolar disorder following his diagnosis last year. The court finds these are exceptional circumstances warranting continued support of the sons while they are pursuing their post-secondary education after the age of 23.

6. The parents' funding of an Education and Health Care Trust will provide for the cost of the sons' education and health. The sons are still dependent on their parents for additional costs that may not be covered by the trust. . . . [T]he parties should each pay their proportionate share of other reasonable living expenses for the boys until they no longer are financially dependent not later than age 26.

7. The parties, who are both double Ivy League graduates, expected their sons to attend college and anticipated financially supporting them in their post-secondary education endeavors.

These findings are supported by substantial evidence, namely Jennifer's testimony regarding the sons' educational history, ability and aptitude to attain postsecondary education, mental health issues, and the funding they require to attain

postsecondary education and pay for their living expenses.[10]  Because there are
"exceptional circumstances, such as mental, physical, or emotional disabilities,"
the trial court did not abuse its discretion in ordering the parties to provide
continued postsecondary educational support for the children beyond age 23.

Relatedly, Keith argues the trial court's order erroneously "conflates support
paid to a dependent adult with postsecondary education."  This argument is
conclusory at best, as Keith does not explain the significance of any such error.
Regardless, this argument fails because none of the authorities cited by Keith
stand for the proposition that a child support order cannot encompass support for
both a "dependent adult" and "postsecondary education." *See* RCW 26.19.025;
*Cota*, 177 Wn. App. 527; *In re Marriage of Stout*, 89 Wn. App. 118, 123, 948 P.2d
851 (1997); *Childers v. Childers*, 89 Wn.2d 592, 596-97, 575 P.2d 201 (1978).  To
the contrary, the plain text of RCW 26.19.090(2), which governs postsecondary
educational support, requires that a child be "in fact dependent and . . . relying
upon the parents for the reasonable necessities of life" to receive postsecondary
educational support.  Here, the court's child support order repeatedly clarifies that
it concerns postsecondary educational support for the children.  The order also
identifies several categories of "[r]easonable living expenses" that are

---

[10] Keith argues in his brief that the trial court erred in finding that B was diagnosed with or receiving treatment for bipolar disorder because Jennifer's testimony about B's bipolar diagnosis was "inadmissible hearsay."  At oral argument, Keith took this argument a step further, claiming that there is *no* admissible testimony that B was diagnosed as bipolar because "[t]he judge sustained the objection [to this testimony] throughout the trial."  Wash. Ct. of Appeals oral argument, *supra,* at 6 min., 57 sec. to 7 min., 48 sec.  Contrary to Keith's argument, Jennifer testified *without objection* that B "is being treated for bipolar disorder presently, and he will continue to require therapy, therapeutic academic tutoring and also trauma support and psychiatry."  We decline to reach Keith's argument that this testimony was inadmissible because it was not properly raised in the trial court.  *See* RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court.").

encompassed by the child support order, such as groceries, household expenses and utilities, travel back home, school activities, cell phones, rent, vehicles, insurance, and "[o]ther expenses as set forth in the Student Budget at the University the child attends." Keith's argument regarding this alleged error thus fails.

### 3. Declining to impute income to Jennifer

Keith argues the trial court erred by declining to find that Jennifer is voluntarily unemployed such that it must impute income to her for child support purposes. We disagree.

In calculating the child support obligation of each parent, "[t]he court shall impute income to a parent when the parent is voluntarily unemployed or voluntarily underemployed." RCW 26.19.071(6). In determining whether a parent is voluntarily unemployed, the court considers factors such as the parent's assets, residence, employment and earnings history, job skills, educational attainment, literacy, health, age, employment barriers, record of seeking work, the local job market, the availability of employers willing to hire the parent, the prevailing earnings level in the local community, and any other relevant factors. *Id.*

Keith's argument is unpersuasive for the same reasons discussed in part II(B) above regarding Jennifer's ability to pay spousal maintenance: Jennifer was only unemployed for approximately one year before trial, she has attempted to find work since separation, and she spent considerable time and effort caring for the marital community and the parties' children during the pendency of this case. *See Kaplan*, 4 Wn. App. 2d at 485 ("Care for the community and children are 'other relevant factors' that the trial court must consider in determining whether [a party]

was voluntarily unemployed.") (quoting RCW 26.19.071(6)). Thus, we conclude that substantial evidence supports the trial court's finding that Jennifer was not voluntarily unemployed.

The two cases cited by Keith are unpersuasive here. First, he cites *In re Marriage of Pollard*, 99 Wn. App. 48, 52, 991 P.2d 1201 (2000), for the proposition that "[i]ncome must . . . be imputed [to a] voluntarily unemployed parent." In *Pollard*, another division of our court reversed a trial court's reduction of the mother's child support obligation after she left full time employment to work "full time as a mother and homemaker" because her choice was voluntary and motivated by her decision to stay home and raise her children from her new marriage. *Id.* at 50-51. However, in *Kaplan*, we recently stated that "to the extent . . . *Pollard* stand[s] for the proposition that a trial court must impute income anytime a spouse voluntarily stays home in support of the community to raise children, we decline to follow [that] case[]." *Kaplan*, 4 Wn. App. 2d at 486. Moreover, *Pollard* is distinguishable because Jennifer continues to seek employment.

Second, Keith cites *In re Marriage of Sacco*, 114 Wn.2d 1, 4, 784 P.2d 1266 (1990), and argues the trial court improperly refused to determine Jennifer's "income if she were 'employed at the level at which [she] is capable and qualified.'" In *Sacco*, the court remanded the case for the trial court to recalculate child support because the trial court did not use "a worksheet in the form required by the statute" or state the "specific reasons for deviation from that worksheet." *Id.* at 5. The court rejected wife's argument that "the inability of the trial court to ascertain [her] income makes filling out the worksheet impossible" because the trial court "made findings of fact imputing income to [wife]. Its doubt about the accuracy of its figures does

not make filling out a schedule impossible." *Id.* at 4. Keith's reliance on *Sacco* is misplaced because the trial court here did fill out a child support worksheet using the incomes each party would receive from the interest generated from their investment assets. Moreover, the trial court did not find that Jennifer is voluntarily unemployed.[11]

### 4. Keith's ability to pay child support

Keith cites *In re Marriage of Shellenberger*, 80 Wn. App. 71, 82, 906 P.2d 968 (1995), and argues his child support obligation "is grossly disproportionate to [his] ability to pay." In *Shellenberger*, we remanded for a new trial where the trial court imputed income to a disabled father and ordered him to make monthly postsecondary educational support payments to his adult child in an amount that exceeded the father's income and prevented him from meeting his support obligation for another minor child. *Id.* *Shellenberger* is distinguishable because the trial court here did not impute income to Keith, Keith is not supporting another child, and Keith has significant assets from which he can pay his child support obligation while meeting his own needs.[12] Thus, we reject this argument.

---

[11] To the extent Keith relies on *Sacco* to argue the trial court was obligated to determine the parties' income for purposes of awarding spousal maintenance, this reliance is misplaced because *Sacco* involved the calculation of child support, not spousal maintenance. Keith's reliance on *In re Marriage of Jonas*, 57 Wn. App. 339, 340, 788 P.2d 12 (1990), is similarly misplaced.

[12] Keith also cites *Shellenberger*, 80 Wn. App. at 85, for the proposition that "[c]ourts must also make findings 'as to the cost and availability of college education in the child's chosen field at publicly funded institutions before ordering an objecting parent to support a more expensive private college education.'" We decline to consider this argument because Keith provides no analysis for how this legal principle applies to this case, such as record cites to evidence of the cost and availability of education in the children's chosen fields at public schools. *See* RAP 10.3(a)(6) (requiring the appellant to provide an "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record").

**5.     Ordering Keith's child support obligation to survive his death**

Keith also asserts the trial court's child support order erroneously "provides [Keith's] obligation to support his children survives death."   This argument fails because RCW 26.09.170(3) provides, "Unless otherwise agreed in writing *or expressly provided in the decree*, provisions for the support of a child are terminated by emancipation of the child or by the death of the person required to pay support for the child." (Emphasis added).   Here, in accordance with RCW 26.09.170(3), the child support order expressly provides that the parties' child support obligations "will remain an obligation of the party and will be a charge against either party's estate to the extent not covered by insurance or Social Security benefits."   In support of his contrary argument, Keith cites to *Cissna v. Beaton*, 2 Wn.2d 491, 98 P.2d 651 (1940), and *Riser v. Riser*, 7 Wn. App. 647, 501 P.2d 1069 (1972), and claims he "has a right to make testamentary disposition of property and his duty of support terminates upon his death."   But Keith's reliance on these cases is misplaced because both cases predate the enactment of RCW 26.09.170(3).

**6.     Arbitration provision**

Keith argues the trial court erred by delegating child support disputes to binding arbitration because there is no "enforceable agreement to arbitrate" as required by RCW 7.04A.070(1).   The court's child support order states, "Disputes regarding categories of support that are not agreed, shall be decided in Binding Arbitration by an agreed arbitrator."   Jennifer concedes the trial court erred in this respect because it could not order the parties to arbitrate child support disputes in the absence of a King County local rule providing for such relief.   *See* RCW

7.06.020(2) (providing that civil actions in which the sole relief sought is the establishment, termination, or modification of child support payments are subject to mandatory arbitration only "[i]f approved by a majority vote of the superior court judges of a county which has authorized arbitration"). We accept Jennifer's concession and reverse and remand for the trial court to strike the arbitration provision from the child support order.

### 7. Course load requirement

Keith argues we should remand for the trial court to clarify its child support order because it "conditions [Keith's] support obligation on the child being 'a full-time student' who is 'carrying a half-time course load,' which is internally inconsistent." The court's order states, "For a child to be eligible for assistance from the parties under this paragraph, he must be a full-time student in an institution of higher learning carrying a half time course load as defined by the institution he attends, be in good standing, and provide his grades to his parents." As Keith correctly notes, these terms—"full-time student" and "half time course load"—are undefined and they appear to be contradictory.[13] We therefore remand for the trial court to clarify the requirements to receive child support while a student.

### 8. Duration of postsecondary educational support

Keith similarly claims that the trial court's child support order does not clearly state the end date for such support. In a paragraph entitled "End date for support," the order states that it "remains in effect for each child until that child

---

[13] By way of example, Keith notes that a "full time" undergraduate student at Western Washington University (where B is a student) must be enrolled in 12 credits, whereas a "half time" student need only be enrolled in 6 credits. *Credits and Class Status*, Western Washington University, Registrar's Office, https://registrar.wwu.edu/registrationpolicies/credits-and-class-status (last visited September 10, 2024).

reaches 26 years of age or until they are no longer financially dependent." This suggests that a child who is financially independent—at whatever age—is not entitled to receive child support. Yet the child support order also states, in a paragraph entitled "Child Support," that "[t]he parties shall pay [S] and [B's] living expenses in their proportional shares according to the worksheets through age 26," which suggests that a child who is 26 years old or younger *shall* receive support payments even if the child is financially independent. Because both statements cannot be true, we remand for the trial court to clarify these provisions.

**D.    Property division**

Keith raises several arguments regarding the trial court's characterization, valuation, and distribution of the marital estate. Property division in dissolution proceedings is governed by RCW 26.09.080, which states in relevant part:

> [T]he court shall, without regard to misconduct, make such disposition of the property and the liabilities of the parties, either community or separate, as shall appear just and equitable after considering all relevant factors including, but not limited to:
>
> (1)    The nature and extent of the community property;
>
> (2)    The nature and extent of the separate property;
>
> (3)    The duration of the marriage . . . ; and
>
> (4)    The economic circumstances of each spouse . . . at the time the division of property is to become effective . . . .

A trial court has broad discretion to determine what is just and equitable under the circumstances, and we review the trial court's division of property for manifest abuse of discretion. *Kaplan*, 4 Wn. App. 2d at 476-77.

We agree with Keith that the trial court erroneously assigned no value to the parties' membership to the STC before awarding it to Jennifer. We reverse the

trial court's decision to award no value to the STC membership and remand for the trial court to enter findings of fact regarding the value of the STC membership and include it among the community assets to be divided between the parties. We reject Keith's remaining arguments regarding the trial court's division of property.

### 1. Separation date

A trial court must characterize property as either community or separate property when distributing property in a dissolution action. *In re Marriage of Kile*, 186 Wn. App. 864, 875, 347 P.3d 894 (2015). Property acquired during the marriage is presumed to be community property. RCW 26.16.030. But "[w]hen spouses . . . are living separate and apart, their respective earnings and accumulations shall be the separate property of each." RCW 26.16.140. Addressing this issue, the trial court found that the parties' marital community ended on February 8, 2021, when Keith moved into the Vashon Home, because "it was clear that the physical separation . . . reflected an emotional divide," the parties' communications after this date focused "upon the end of their marriage, not preserving it," and the parties' conduct ultimately "exhibited a decision to renounce the community." Keith argues that substantial evidence does not support that finding. We disagree.

Preliminarily, this issue appears to have been conceded. When Jennifer filed her petition for legal separation on July 22, 2021, she asserted that the marital community ended on February 8, 2021. Keith filed an answer in which he did not dispute that the marital community ended on this date. That admission is binding on Keith. *See City of Oak Harbor v. St. Paul Mercury Ins. Co.*, 139 Wn. App. 68, 72-73, 159 P.3d 422 (2007) (where "City conceded in its trial court brief that R &

R's negligence caused the property damage in this case," it "cannot now claim that something else caused the . . . damage"). Because Keith cannot properly take a contradictory position in this appeal, we reject his argument that the trial court did not properly decide this issue.

In any event, substantial evidence supports the trial court's determination. February 8, 2021 is the date that Keith moved to the Vashon Island Home. When he did so, he cleared out most of his closet at the Seattle Home and took many of his belongings and the family's dogs with him. While on Vashon Island, Keith told his family they could only contact him once per day at 10 a.m., and he later told Jennifer to stop contacting him altogether unless their marriage therapist was present. Jennifer then told Keith and the children she would be pursuing legal separation, and Keith told Jennifer she had a "black soul" and that he did not want to speak to her again "for a very, very long time." This evidence amply supports the trial court's finding.

Keith cites to *Seizer v. Sessions*, 132 Wn.2d 642, 659, 940 P.2d 261 (1997), and argues that RCW 26.16.140 does not apply to him because he was "mentally ill or incompetent during the separation." In *Seizer*, we held that "[a]n incompetent person's silence cannot be enough to trigger" separation under RCW 26.16.140. *Id*. *Seizer* is distinguishable because the abandoned spouse in that case, unlike Keith, was declared incompetent by a court. *Id.* at 647. Further, the record indicates that Keith's mental state did not render him "silent" such that he could not renounce the marital community.

**2. Predistribution of community property to Keith**

Keith argues the trial court erred by "Award[ing] a Fictional Pre-Distribution of Community Property" to him in the amount of $644,509. We disagree.

When distributing property, the court may consider "gross financial improvidence, the squandering of marital assets," and otherwise "negatively productive conduct" by a party." *In re Marriage of Steadman*, 63 Wn. App. 523, 528, 821 P.2d 59 (1991) (quoting *In re Marriage of Clark*, 13 Wn. App. 805, 808-09, 538 P.2d 145 (1975)); *see also In re Marriage of Wallace*, 111 Wn. App. 697, 708-09, 45 P.3d 1131 (2002) ("In making its property distribution, the trial court may properly consider a spouse's waste or concealment of assets."). Here, the trial court made the following findings regarding Keith's management of assets after the date of separation:

> After the date of separation – 2/8/21 – [Keith] dissipated all of the cash he controlled. Notably, he did so against the explicit wishes of [Jennifer]. The testimony of Mike Urban, an estate liquidator, was credible that the spending seemed deliberate and retributive. Specifically, Mr. Urban testified that [Keith] purchased many items from Mr. Urban who, in his communications with [Keith], had the impression [Keith] bought items so [Jennifer] would not have access to these funds expended. The court finds that these funds were used to purchase goods that solely benefitted [Keith], were purchases [Jennifer] explicitly disapproved of, and [Keith's] conduct did not serve any community purpose. Thus, [Keith's] actions in purchasing these goods were wasteful to the marital community.

The trial court ultimately ordered that "the amount [Keith] spent, $644,509, will be awarded to [Keith] as a pre-distribution of the community funds," and the court stated that it "considered this predistribution when making its just and equitable division of the marital estate."

Substantial evidence supports the trial court's finding that Keith's spending was wasteful to the marital community. Jennifer presented evidence that between February and September 2021, Keith spent over $433,000 from the parties' joint account using credit cards he controlled, transferred over $154,000 from the joint account to himself, and wrote checks totaling approximately $92,000 from the joint account. Keith bought a truck for over $110,000, bought art totaling approximately $40,000, and made an offer to purchase a third house. Urban testified that Keith, after moving to Vashon Island, purchased over $111,000 in property from his store because Keith "was in some kind of dispute with his wife" and was "putting his money into goods so that [Jennifer] couldn't get the money." Urban recalled Keith saying, "she can't get my money if I spend it all." While Keith claims he purchased this property as inventory for a start-up business, the record indicates that Keith simply purchased the property and stored it at a warehouse and in the parties' Vashon Home without taking concrete steps toward establishing the business. Keith admitted that he "didn't raise any money" for the business and, "I wouldn't say it was a great idea." Additionally, Keith spent over $76,000 on aesthetic improvements to the Vashon Home that were never completed. Jennifer objected to virtually all of this spending, and she presented ample evidence at trial tracing Keith's spending from the parties' community property. The trial court did not abuse its discretion in treating the community funds expended by Keith as a predistribution of community property.

Keith contends that "if an expenditure is intended to benefit the community and it does not pan out, then it is still a community expense." This argument is unconvincing because these expenditures were made after the marital community

ended on February 8, 2021, at which time the parties began "living separate and apart."  *See* RCW 26.16.140; *see Aetna Life Ins. Co. v. Bunt*, 110 Wn.2d 368, 372, 754 P.2d 993 (1988) ("It is the fact of community that gives rise to the community property statute [RCW 26.16.030]; when there is no 'community,' there can be no community property.").  For similar reasons, Keith's reliance on *In re Marriage of Schweitzer*, 81 Wn. App. 589, 596-98, 915 P.2d 575 (1996), is misplaced because that case concerned whether a spouse's disposition of community funds during the marriage was made in the community interest.  Even if Keith spent these funds before the marital community ended, his argument fails because these expenditures were not intended to benefit the community.

Keith further argues, "The community is owed a right of reimbursement from Jennifer for the community funds she spent on her post-financial restraint living expenses and attorney fees."  Keith alleges that Jennifer transferred $100,000 of community funds into her individual account and "used that money to pay off her credit card charges monthly as well as her attorney fees."  This argument is unpersuasive because Jennifer was authorized by a temporary order—which was issued after Keith began depleting the parties' community funds and restricting Jennifer's access to their accounts—to "pay her living expenses and expenses that both parties are required to pay" from this community account.[14]

---

[14] Additionally, Keith argues that Jennifer "may have deposited her severance she received in January 2022, into her BECU accounts, transferred some of that money into her Operating Account, and thereby commingled community and separate funds."  We decline to consider this argument because Keith fails to support this speculative assertion with citation to the record.  *See* RAP 10.3(a)(6); *see also In re Disciplinary Proceedings Against Whitney*, 155 Wn.2d 451, 467, 120 P.3d 550 (2005) (appellate courts are not required to scour the record and construct arguments for counsel).

Keith next argues the trial court erred by not deducting the $86,701.64 in severance pay he received on February 18, 2021 (after the separation date) from his $644,509 pre-distribution of community property. This argument is unpersuasive because the trial court's decision was just and equitable under the circumstances. *See* RCW 26.09.080. The record indicates that Jennifer deposited as much as $129,000 of her separate property into the parties' community accounts, and the trial court did not credit her with these funds upon dividing the marital estate. Jennifer also paid community expenses after separation using her own separate funds, and the uncompensated time she spent preparing the parties' homes for sale generated substantial income for the marital estate. We conclude the trial court did not abuse its discretion in this respect.

### 3.     Seattle Tennis Club membership

Before trial, the Schorschs owned a membership to the Seattle Tennis Club, which Jennifer, Keith, and their children used for playing tennis, swimming, and socializing with friends. In the dissolution proceeding below, Keith agreed that Jennifer could "have the Seattle Tennis Club membership" but asserted that "the membership's $50,000 fair value will have to be attributed to the membership in the overall distribution" because the trial court was "required to value all property separate and community and characterize it in the Dissolution Decree." The trial court ultimately awarded the STC membership to Jennifer "at no value" and did not classify the membership as an asset in dividing the parties' community property. Keith argues the trial court abused its discretion by so ruling. We agree.

Jennifer's principal argument regarding the membership is that it has no value because the STC prohibits members from selling their membership. While

that fact is undisputed, it does not conclusively resolve the valuation issue in this proceeding. Washington law requires that a dissolution court "make such disposition of the property and liabilities of the parties." RCW 26.09.080. Intangible property may have a value for purposes of dividing a marital estate even if the property cannot be sold. *See In re Marriage of Luckey*, 73 Wn. App. 201, 205, 868 P.2d 189 (1994) (in valuing "professional goodwill" of a business, "the important consideration is not whether it can be sold to another party, but whether it has value to the professional"); *In re Marriage of Landauer*, 95 Wn. App. 579, 590, 975 P.2d 577 (1999) (real estate burdened by restraints on alienation of ownership may retain "utility value" even if it has no market value).

Thus, while the STC membership cannot be sold, this restriction decreases rather than vitiates the value of the property. We therefore remand this issue to the trial court to resolve this issue in accordance with controlling case law. In so doing, the trial court may require additional expert testimony at its discretion.[15]

**E.      Attorney fees for Keith's discovery violations**

Keith argues that "[t]here are insufficient facts to support a conclusion [Keith] willfully and deliberately committed a discovery violation." The trial court awarded Jennifer $15,000 in fees incurred as a result of Keith's late disclosures of his experts' reports and opinions and $6,200 for the time that Dr. Beaver spent responding to them. We decline to consider Keith's argument because it is unsupported by any citation to the record or legal authority. *See* RAP 10.3(a)(6);

---

[15] Keith also argues his "inheritance from his father identified on the property distribution spreadsheet as a New York Schwab Account is his separate, not community, personal property." This argument is meritless because the trial court awarded this account to Keith as his separate property.

*Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (assignment of error is waived where appellant presents no argument on the claimed assignment).[16]

**F.      Attorney fees for Keith's intransigence**

Keith argues the trial court's award of $75,000 in attorney fees to Jennifer due to his intransigence is "unsupported" because he "was not Intransigence [sic] and the Fee Award was Excessive."  In response, Jennifer argues that Keith has waived this argument by failing to challenge this attorney fee award below.  Under RAP 2.5(a), we "may refuse to review any claim of error which was not raised in the trial court."  We agree with Jennifer and conclude that Keith has failed to preserve this argument on appeal.

Before, during, and after trial, Jennifer made oral and written requests for the trial court to order Keith to pay $75,000 in attorney fees that she unnecessarily incurred due to Keith's intransigence, including fees relating to (1) at least four mediation sessions that were unsuccessful due to the Keith's and/or his attorney's lack of good-faith participation, (2) filing motions for temporary orders requiring Keith to authorize payment of the parties' and children's expenses from a joint account, and (3) responding to Keith's repetitive and unsuccessful motions to reconsider, revise, and vacate a restraining order (which order Keith does not challenge on appeal).  Jennifer identified Keith's actions that she alleged were intransigent, the amount of fees she incurred in addressing those actions, and the

---

[16] We also decline to consider Keith's argument that the trial court, in calculating the parties' child support obligations, "incorrectly attributed hypothetical interest income" because Keith again fails to cite any legal authority in support of this argument.  RAP 10.3(a)(6).

portion of the fees that should be recoverable. In its findings of fact and conclusions of law, the trial court ordered that "[e]ach party should pay their own fees or costs, except the husband should pay a portion of the wife's attorney fees for his intransigence as listed below," and then stated the following:

1. After separation, [Keith] withheld his agreement to release funds to pay shared expenses including for the parties' two sons and [Jennifer] was forced to file a motion for a temporary order. The Court ordered [Keith] to cooperate and release the college funds.

2. [Keith] refused to disburse 529 funds to pay tuition even though doing so was required by the temporary order.

3. Following entry of a temporary restraining order in December 2021, [Keith] caused fees to increase by filing motions to reconsider, revise, and vacate the order all of which were denied.

4. [Keith] refused to provide discovery requiring [Jennifer] to file a motion to compel resulting in an order compelling discovery.

5. [Jennifer] incurred fees in total of $245,654 prior to trial. Based on the Amended Attorney Fee Declaration of [Jennifer's attorney], the Court is ordering [Keith to] pay [Jennifer's] fees in the amount of $75,000, which is the amount the Court finds that [Jennifer] unnecessarily incurred due to [Keith's] intransigence.

Despite repeatedly acknowledging below that Jennifer sought these attorney fees based on Keith's intransigence and that the trial court intended to award them to her, Keith did not file any response opposing Jennifer's request for attorney fees or argue at the post-trial hearings that the trial court should not award her fees due to his intransigence. Nor did Keith challenge the trial court's award of attorney fees in his motion for reconsideration.

On appeal, Keith has not identified where he objected to or opposed Jennifer's attorney fee request below, and his reply brief does not respond to

Jennifer's contention that this argument is waived under RAP 2.5(a). Under these circumstances, we conclude that Keith has waived his challenge to the trial court's award of attorney fees to Jennifer. *See In re Marriage of Freeman*, 146 Wn. App. 250, 259, 192 P.3d 369 (2008) (declining to consider attorney fee argument for the first time on appeal).[17]

III

We reverse in part and remand for further proceedings to (a) strike the arbitration provision in the child support order, (b) clarify the educational requirements to receive child support while a student, (c) clarify the apparent inconsistency regarding the termination date for post-secondary educational support, and (d) properly value the STC membership. In all other respects, we affirm.

Feldman, J.

WE CONCUR:

Díaz, J.          Colburn, J.

---

[17] In his reply brief, Keith raises several additional arguments regarding the trial court's award of attorney fees that he did not raise in his opening brief, including that the trial court "made no lodestar analysis or other findings to support the reasonableness of the fees charged" and that "the trial court's findings and conclusions are not meaningful and are inadequate to affirm the fees awarded in this case." Similarly, Keith argues remand is necessary to clarify "ambiguities" in the court's final order of divorce regarding personal property. We decline to consider these arguments because they were not raised in the opening brief. *See* RAP 10.3(c); *Ainsworth v. Progressive Cas. Ins. Co.*, 180 Wn. App. 52, 78 n.20, 322 P.3d 6 (2014) ("We will not consider issues argued for the first time in the reply brief. The reply brief is limited to a response to the issues in the responding brief. To address issues argued for the first time in a reply brief is unfair to the respondent and inconsistent with the rules on appeal.") (internal citations omitted).